SCHULER, et al v. WALTER, Tax Assessor, et al.
No. 643525-E.

Circuit Court, Duval County.
January 4, 1965.

Marks, Gray, Yates, Conroy & Gibbs, and Franklin Reinstine, all of Jacksonville, and William G. O'Neill, Ocala, for plaintiffs.

Rogers, Towers, Bailey, Jones & Gay, and William Joe Sears, Jr., all of Jacksonville, for defendant Walter, Tax Assessor.

Stallings & Marr, Jacksonville, for defendant Simpson, Tax Collector.

J. Henry Blount, Jacksonville, for defendant county commissioners.

Earl Faircloth, Attorney General, for defendant state comptroller.

WILLIAM L. DURDEN, Circuit Judge.

*Final declaratory decree:* This case is before the court upon application of the parties for a final decree. The court has considered the issues raised by the pleadings, the oral testimony and documentary evidence presented, memorandum briefs, arguments, and proposed decrees submitted by counsel for the parties. Many important questions in this field of law were raised as issues in this case and they require some discussion.

The testimony and arguments consumed six full days. The briefs originally submitted and the proposed decrees total several hundred pages. Scores of constitutional provisions, statutes, regulations, and cases have been cited. This decree will therefore be of some unavoidable length.

### Jurisdiction of the court

The Florida constitution provides that the circuit courts shall have exclusive original jurisdiction in all cases in equity involving the legality of any tax or assessment. (Art. V, Sec. 6). This jurisdiction is confirmed by statute. (Sec. 196.01 Fla. Stats. 1963). Refined aspects of the court's jurisdiction are discussed later under the appropriate titles.

The court has heretofore determined and does here confirm that it has jurisdiction of the subject matter and of the parties to this litigation. In reaching this conclusion, the court notes that there is a stirring in the land which is calling upon the judicial branch of the government to make true and real the guarantees of the federal and the various state constitutions.

Theoretically, these fundamental provisions are guarantees which have existed for centuries but many have not been fulfilled and still remain as ultimate goals.

These provisions are not couched in Latin or legal phrases which were chosen to confuse lawyers, confound judges or to delude the public. Most generally, the terms are simply stated in the generic sense. But when one group or interest has been favored by past constructions or failure to construe, the conflict develops.

It is only because our economic and intellectual developments have established such a broad base that we can even hope for fulfillment of these dreams which were first stated in the Magna Carta, repeated in the Declaration of Independence and confirmed in the federal and various state constitutions.

The three principal movements in the courts today are aimed at obtaining equal rights, equal representation in state legislatures and fair and equal taxation at the state and local level.

It is neither the responsibility, the right, nor the desire of the court to comment on the first two fields of jurisprudence for this case relates only to the field of taxation.

Already the state courts have lost the prerogative of determining any aspect of the first two issues. This loss of jurisdiction has been due more to omissions by the state courts than to preemptions by the federal court.

It should therefore be recognized that in the field of taxation at the local and state level recourse may also be available in the federal courts under the equal protection clause of the federal constitution if the state courts fail in this opportunity to resolve state issues in the state courts.

### Propriety of declaratory action

The declaratory decree statute provides that the court may construe anyone's rights, status, or other equitable or legal relations that are affected by a statute and may determine any question of construction or validity arising under a statute and obtain a declaration of rights, status or other equitable or legal relations thereunder. The statute further provides that parties may pray for additional, alternative, coercive, subsequent or supplemental relief in the same action.

The statute further provides that any declaratory decree may be given or made by way of anticipation with respect to any act not yet done or any event which has not yet happened, and in such case the decree shall have the same binding effect with respect to that future act or event and the rights or liability to arise therefrom, as if that act or event had already been done or had already happened before the decree was given or made.

The statute further provides that the existence of another adequate remedy shall not preclude a decree for declaratory relief. This provision adequately disposes of defendants' contention that this action should have been in mandamus. (Chapter 87, Fla. Stats. 1963).

This suit seeks a declaration and definition of statutory and regulatory terms; it seeks a determination of rights and duties under such provisions; it seeks coercive, subsequent and supplemental relief. The suit is tailor made for a declaratory action.

### Power of court to enforce final decree

Every court has the inherent and intrinsic power to do all things necessary to the complete administration of justice within the scope of its jurisdiction. (8 Fla. Jur., Courts, Sec. 41, page 309).

Thus, a court of equity has the power to enforce its mandatory decrees. (12 Fla. Jur., Equity, Sec. 69, page 234). An injunction or restraining order issuing out of an equity court possessing the requisite jurisdiction must, as long as it continues in force, be obeyed — otherwise, the administration of justice would become a mockery. (17 Fla. Jur., Injunctions, Sec. 93, page 449).

In addition to the case law confirming this inherent power of a court of equity the Supreme Court has promulgated Rule 3.15 of the Florida Rules of Civil Procedure relating to enforcement of final decrees which, in part, states —

" . . . if any other decree, injunction or mandatory order for the specific performance of any act or contract is not complied with, the court or judge, besides, or instead of, proceedings against the disobedient party for a contempt or by sequestration may by order direct that the act required to be done be done, so far as practicable, by some other person appointed by the court or judge, at the cost of the disobedient party, and the act, when so done, shall have like effect as if done by him."

A court of equity will not exercise its power over a public official unless there has been established a clear violation of law or a gross abuse of discretion. In this case both of these conditions, and more, have been found to exist and therefore the full equitable powers of the court have been properly invoked.

It is premature to raise the question as to whether the court will have to exercise the inherent or prescribed power to enforce this decree, or in what manner this could be accomplished but the apparent authority to do so should be before the parties.

### Conclusions on jurisdiction

Construing these constitutional provisions, statutes, rules, and opinions, the court concludes that this is a proper suit in equity for declaratory decree; that this court has the inherent power to effectuate its decrees, and that coercive relief may be granted and compliance required.

### Representation without taxation

This nation was formed and created because the colonists did not believe in "taxation without representation". Now the parties are engaged in this litigation to determine whether or not a segment of a governmental unit in a democratic society under a republican form of government can have "representation without taxation."

## Public free schools

The schools are not parties to this suit. However, any citizen slightly acquainted with state and county government knows that a large portion of state and county revenues are dedicated to this endeavor and the exhibits in this case show this to be true. Therefore, in any legislation, or litigation involving the general taxing powers and procedures, recognition and consideration must be given to providing revenue for the operation of the school system.

The constitution of Florida provides that "The legislature shall provide for a uniform system of public free schools and shall provide for the liberal maintenance of the same". (Art. XII, Sec. 1). Public education is basically a responsibility of the state and in this sense "state" includes county governmental units. (29 Fla. Jur., Schools, Sec. 3, page 29).

The purpose intended to be accomplished in establishing and liberally maintaining a uniform system of public free schools is to advance and maintain proper standards of enlightened citizenship. (State v. Henderson (1939), 137 Fla. 666, 188 So. 351).

The constitution provides that each county shall be required to assess and collect annually for the support of the public free schools therein, a tax of not less than three and not more than ten mills on the dollar on all taxable property in the county. (Art. XII, Sec. 8).

The constitution also provides for up to an additional ten mills on the dollar tax for county school districts whenever a majority of the qualified electors that pay a tax on real or personal property shall vote in favor of such levy. (Art. XII, Sec. 10).

In Duval County there is also a constitutional provision for a five mill school debt service. (Art. XII, Sec. 17).

The county of Duval has been levying at the maximum school tax rates for some years. (Defendant Simpson's exhibits 1 and 2; plaintiffs' exhibit 24). Therefore, the only way to make more county funds available for school purposes is by increased assessments and valuations.

In this connection it should be noted that homesteads are exempt from all taxes including the school taxes, up to an assessed valuation of $5,000. The evidence in this case established that for 1964 there were over 96,000 homestead exemptions granted and that of these, 51,000 were totally exempt. The effect will be discussed later.

In Florida the school system is supported by county and state taxes. The ratio of support is set by constitutional and legislative provision. A default or deficiency at either end creates

grave problems. The total of all county funds is derived from ad valorem taxes and this tax must be properly assessed and collected.

It may very well be that legislative consideration should be given to changing the ratio or even substituting another source of local revenue but the only way to fairly appraise the factors weighing on such a decision is to have full and fair assessments throughout each of the sixty-seven counties of the state.

### The evidence — general findings

1. Each of the plaintiffs is an owner of real property in Duval County, and is a taxpayer.

2. The defendants each hold the public offices as alleged in the complaint.

3. The defendant, Ralph N. Walter, is the first tax assessor in Duval County since 1941 to successfully obtain the necessary funds to initiate a reassessment and revaluation program which has been instituted.

### Central issue

The central issue in this case is the assessment policies, procedures and practices of the assessor of taxes. In the complaint it is alleged that real and tangible properties subject to ad valorem taxation have been under-assessed and that said property is being deliberately, systematically and intentionally assessed at an overall average of approximately 41.64 percent or less of just value, contrary to the requirements of the constitution, statutes and regulations. The assessor denies these allegations. The evidence on this issue will be discussed under three sub-titles — judicial notice, admissions in the intangible tax suit and the proof in this case.

### The evidence — judicial notice

This court gave long and careful consideration to whether or not the doctrine of judicial notice applied to the issue created on the rate of assessments in this county. That doctrine provides that the court must know what every well informed person knows and under such circumstances there is no need of proof.

This court is convinced that every well informed person in this county knows, or at least believes, that real property is assessed at approximately forty percent of its value regardless of the legal phrase used to define that term.

The court is further convinced that every such person believes his, and all other owners' property is deliberately and systematically assessed at this ratio by the county assessor of taxes; and

further, that this practice has subsisted for many years regardless of who occupied the office.

Many of the Florida appellate decisions and opinions remark about the general policy of assessors throughout the state to systematically and deliberately underassess real property. The opinions do not specifically identify the source of their information but in many instances the comments do not seem to be based on actual proof but on facts or knowledge assumed by the courts.

For two reasons, however, the doctrine of judicial notice should not be wholly relied upon. First, there is a rebuttable presumption that a public officer has carried out his duties in accordance with the requirements of law. (Jones on Evidence, 5th Ed., Vol. 1, Sec. 53, and Sec. 124). Secondly, the parties did not rely on this doctrine and submitted proof.

Therefore, while the doctrine may or may not apply it will not be controlling in this case.

### The evidence — admissions in the intangible tax suit

In 1963 the comptroller of the state of Florida brought an action of mandamus against the same assessor who is the principal defendant in this suit. The entire record in that suit was filed in evidence in this case. The petition for writ of mandamus alleged that —

"The Florida Times-Union, a newspaper published in Jacksonville, Florida * * * carried a news item * * * wherein it is stated that 'Duval County Tax Assessor, Ralph N. Walter, yesterday announced he will reduce the assessments on intangible personal property to save local taxpayers nearly $2 million in 1963. Walter said more than 22,000 Duval taxpayers— corporations and individuals—will benefit by his reduction of the assessment from 100 percent of value to 42 percent. He said this will bring the intangible assessment ratio in line with the average of 41.64 percent on real estate and 42.5 percent on tangible personal property.'"

In his return the assessor admitted the truth of the allegations just quoted.

In the order quashing the alternative writ of mandamus the circuit judge hearing that case stated —

"Turning to the facts involved in this controversy, it appears that the respondent, unless otherwise commanded herein, will assess all intangible personal property placed upon the 1963 Duval County intangible tax roll, now due for certification to the equalization board, upon a basis of 42 percent of its full cash value. Respondent asserts that his motive in applying such 42 percent ratio is to bring the assessed valuations upon in-

tangibles in line with the ratios applied in assessing other classes of property upon their respective rolls, which average 41.64 percent on real estate and 42.5 percent on tangible personal property, to the end of achieving conformity with his interpretation of the constitutional mandate for just valuations for all property placed upon the 1963 rolls; and that to do otherwise, and single out intangibles alone for assessment at 100 percent of full cash value, when other types of property on the tax rolls are assessed at the lower ratios mentioned, would impose disproportionate burdens upon ad valorem taxpayers in Duval County, and thereby violate the constitutional mandate for just valuation.

"The practice of assessing real estate at less than full value has prevailed in Duval County for years past, and has been well known to relator during his tenure in office."

In 13 Fla. Jur., Evidence, Sec. 222, commenting upon admissions in a prior suit, it is stated —

" . . . The discussion in this section is limited to the use of pleadings and admissions therein as evidence in other actions, as distinguished from the effect of pleadings as admissions in the action in which they are filed.

"The general rule is that statements in a pleading have evidentiary value, and an admission of a fact by a party in a pleading may be introduced against him in another proceeding, if revelant * * * . Thus, a sworn complaint filed by a party in a prior suit in equity is admissible against him in a subsequent action, where he seeks to deny the existence of a partnership relation alleged in the complaint. * * * And of course, the admission may be overcome by evidence explaining the apparent inconsistency."

It would appear from the position taken by the assessor in that suit that he, in fact and in law, confirmed the conclusion that real and tangible personal property in this county has not been and is not now being valued for assessment purposes in accordance with the requirements of the constitution, the statutes, and the regulations, but instead was and is being deliberately and systematically underassessed at a fractional ratio of just value.

As a matter of fact, if his testimony in this cause had been as unequivocal as the legal position stated in that suit the court would have been justified in simply entering an order requiring him to multiply the assessment valuations by 2.38 or whatever factor would bring the ratio from 41.64 percent to 100 percent of just value.

A public official should not be permitted to take a position in one suit to achieve his desired results and a year later take an inconsistent position to defend another suit instituted against him.

In this case the assessor stated that he believed the intangible tax was unjust and unneeded, that the then governor sought repeal of that law and that this was also his ultimate goal; and accordingly, he reduced assessments on intangibles to what *he considered consistent with his policy in assessing real and personal property.*

No member of the executive department has the right or authority to determine that an act is unconstitutional or improper and fail to enforce it in whole or in part because of *his view as to what the constitution and laws of Florida should provide.*

He also testified in this suit that he intended to do all he could to protect homestead exemption (impliedly at the present level) and that he is still trying to do so; that he laid his thinking on the line before the voters and won. He and the voters have the right to seek an amendment to the constitution raising homestead exemption from the present limit of $5,000 to $12,500 but neither may appropriate to themselves the achievement of this desire by deliberate and systematic underassessment, contrary to law.

He may have framed his election campaign on that basis, but it is unconstitutional for him to conduct his office on that basis.

Some authorities have suggested the appointment of assessors with skill in appraisal methods but that is not before this court. (XVII Univ. of Fla. L.R. 83).

Ours is a government of laws and not of men and the courts should be ever vigilant to preserve the superior status of the law over any man, group or interest.

*The evidence — proof on issue of assessing policies*

The assessor and his administrative assistant both testified that the schedules and other basic criteria for the assessment of real estate and improvements thereon were all formulated in 1941 and that there has been no revision of schedules and criteria since that time. They testified further that every tax roll from 1964 back has been based on the preceeding year so that, except for additions and corrections, the roll is basically the same as it was in 1941.

In response to a direct question the assessor testified that the 1963 tax rolls and consequently the 1964, were prepared and assessed at full cash value.

This direct testimony does not fit very well with the implications, indications and other direct testimony of himself and his assistant.

They both agree that new criteria for assessment purposes should be and have been established; that they are in the process of a revaluation program; that when this program is concluded that the total tax rolls will be increased between two and three times its present value.

The assistant testified directly that he could not have the tax rolls properly assessed under the constitutional mandate, legislative requirements, and regulatory standards until the office completed the revaluation.

This latter testimony is proof in and of itself sufficient to justify the conclusion that the assessment standards and practices heretofore and presently being used are improper, illegal and unconstitutional.

Neither of these witnesses would directly admit that real and tangible personal property are assessed on a basis of approximately 40 percent of just value but they did admit that the total rolls approximated this ratio; and that when an individual taxpayer complained, his assessment was adjusted to that ratio.

The assistant testified that it would be fair to state that the level of county assessments was *understood* to be at the ratio of 41.64 percent, although such *understanding* was never officially expressed or admitted except perhaps in the intangible tax suit and in other suits by individual taxpayers.

*The evidence — conclusions on assessment practices*

Based on the direct proof; implications by reason of impeached testimony and supplemented by qualified admissions in the intangible tax suit, the court finds and declares that the assessment policies and practices, procedures and standards employed by the office of the assessor of taxes for Duval County are improper, unfair, unjust, discriminatory, arbitrary, and designed to accomplish unfair and unequal taxation among the property owners of this county and therefore unconstitutional and illegal.

*Assessment practices — law, prior to homestead exemption*

The Supreme Court of Florida indicated that prior to 1934, it was the universal, recognized and accepted practice of the various county assessors to systematically and deliberately underassess all property. The court stated that as long as everybody's property was equally underassessed, no one could complain because all were treated equally, they were assessed equally and therefore were taxed equally. No one was heard to complain successfully in our courts except upon a showing of arbitrary discrimination and fraudulent action of the assessor in evaluation such taxpayer's particular property. (Camp Phosphate Co. v. Allen, 77 Fla. 341, 81 So. 503).

### Constitutional homestead exemption

The court takes judicial notice of the great depression of the late twenties and early thirties and of the severe economic impact of the real estate boom and crash in Florida of the same period. The court takes judicial notice of the national recovery movement of the early 1930's which included the encouragement of homestead land ownership in order to break away from the then existing evils of absentee landlord ownership and tenant occupancy of the vast majority of lands and homes in this nation.

Coincidental with the federal government's movement to provide funds for home ownership the people of the state of Florida in 1934 adopted the constitutional homestead exemption provision. This provision states that every homesteader shall be entitled to an exemption from all taxation, except for assessments for specific benefits, up to the assessed valuation of $5,000 on the said home and contiguous real property but *no such exemption of more than $5,000 shall be allowed to any one person or on any one dwelling house.* (Art. X, Sec. 7).

The court takes judicial notice of the vast increase of home ownerships which were promoted by the national legislative programs and the supplementing state action. Florida is one of the very few states to still provide for homestead exemption and it is not the purpose of this decree to debate the merits of that issue. Such exemption does exist, it is organic and is recognized by this court and will be granted every reasonable intendment thereof.

### Assessment practices — law subsequent to homestead exemption

In Cosen Investment Company v. Overstreet, 154 Fla. 416, 17 So. 2d 788, a taxpayer complained that his assessment was made on the basis of one hundred percent of value when other taxable properties in the county had been assessed on the basis of seventy-five percent. Plaintiff's contention was that if all other properties were assessed on the basis of seventy-five percent that his property should be assessed on the same basis and contended that such a valuation would be valid; with this the court disagreed and stated —

" . . . Appellant relies upon our opinion, Camp Phosphate Company v. Allen. This case does not support appellant because, as was pointed out there, the purpose of the law was to render the tax burden uniform, equal and just and if all property was assessed at fifty per cent of its cash value the purpose of the law was carried. Such logic is not now tenable because by the adoption of Art. X, Sec. 7, to the Florida Constitution, homesteads to the extent of $5,000 are exempt from taxation. To perpetuate the practice of assessing all property

at a less percentage than that directed by the statute would necessarily result in favoring the homesteads. The logic of the opinion in Camp Phosphate Co. v. Allen, supra, is no longer applicable because the reduced value, even though uniformly lower, is no longer just."

The Cosen case has not been overruled or disapproved by the Supreme Court, but has in some instances been cited or quoted from with approval by other courts. In State v. McNayr, Fla., 133 So. 2d 312, text 314, the Supreme Court, after referring to the contention that the valuations there involved were grossly inadequate, resulting in the homesteads being given preferential tax treatment over other types of real estate, said that "this conclusion was grounded on the proposition that when real estate is assessed at anything less than full cash value, then the constitutional provision which exempts homesteads up to five thousand dollars of valuation, results in an inequality in favor of the homestead owner."

On an assessment of 40 percent of full cash value, a home having a value of $12,500 would be totally exempt; at 50 percent of such value, a home having a value of $10,000 would be exempt; at 60 percent of such value, a home having a value of $8,333.33 would be exempt; and at 70 percent of such value, a home having a value of $7,142.85 would be exempt and would bear no part of the tax burden.

The evidence in this case indicates that there are on the 1964 tax rolls 96,345 homestead exemptions granted and that of these, approximately 51,000 will pay no taxes because they have an assessed value of $5,000 or less. It is impossible to be exact but it is obvious that if these properties were assessed at just value rather than 40 percent thereof, a large percentage of the 51,000 homesteads totally exempt would be added to the tax rolls and many, if not all, of the 45,000 partially exempt homesteads would be greatly increased in assessed value. The assessments on all other properties would, of course, be equally and ratably increased.

From the opinion of the Supreme Court in the Cosen case and other authorities cited, it is clear that the rule announced in Camp v. Allen is no longer applicable.

In order to comply with the pronouncements of the Supreme Court such practices must cease, not only in this, but in all sixty-seven counties of the state.

### Construction of just valuation and just value

The Florida constitution requires the legislature to provide for a uniform and equal rate of taxation and to prescribe such regulations as shall secure a *just valuation* of all property. (Art. IX, Secs. 1 and 2). It also requires county and municipal taxes

to be assessed and levied upon the principles established for state taxation. The legislature has attempted periodically to enact legislation which would attain this end result.

In 1963 the legislature enacted what the experts term a "just value statute". (Sec. 193.021). This statute requires the assessment of all property in such a manner as to secure a *just valuation* as required by the state constitution. It further requires that in arriving at a *just valuation* the assessor shall take into consideration the seven listed factors.

This court does not agree with those who say that this enactment constituted a great change and variation in the law. Nor does it agree with those law review writers and others who say that the purpose of that law was to give assessors almost uncontrolled discretion. (XVII University of Florida Law Review 83).

To the contrary, this court is of the opinion that the enactment of that law constituted the fulfillment and accomplishment of the duty cast upon the legislature by our constitution.

Counsel for the assessor admits that construction of the term "just valuation" is of immediate concern to assessors, property owners, administrative bodies, and courts throughout the state and yet he urges the court not to undertake this task.

The game of "round robin" among the governmental authorities involved in this vexing problem must stop somewhere, and the attorney general has suggested that the die has been cast at this case. (Atty. Gen. Op. 064-171, Dec. 8, 1964).

Concurrent with a legal discussion of the phrases "just valuation" and "just value" a little exercise in grammar may be helpful. Certainly judicial interpretation must to some extent be based upon proper grammatical construction.

The various phrases that have been construed by the courts are primarily "just value", "fair value", "full value", "cash value", "full cash value", "true value", "true cash value", "actual value", "actual cash value", and "fair cash value".

Throughout the course of litigation on this subject the courts have written thousands of pages of descriptive definitions of these various terms and in the present case the concern over the construction of such phrases are expressed on many pages of the briefs and proposed decrees submitted by counsel.

The uncertainty and conflict seem to have developed over the various adjectives preceding the nouns "valuation" and "value". An adjective can qualify or restrict a noun but cannot change its basic meaning. There are a dozen or more adjectives used to

qualify these nouns and all of them have similar implications with little variance in meaning, but the only constant words in all the phrases used are the nouns themselves.

The thread of truth may then be found in a closer look at these nouns and some of the descriptive surroundings.

"Value" is defined in Webster's dictionary as —

"A fair or proper equivalent in money, commodities, etc., for something sold or exchanged, or *fair price*; the worth of a thing in money or goods at a certain time, or *market price*; estimated or appraised worth or price, or *valuation*; purchasing power, as, the *value* of a dollar fluctuates; exchange value — same as *market price*; nominal value — estimated *market value*, as value named in an appraisement."

Valuation is described in that reference as —

"The act of estimating the value or worth; appraisement; evaluation — as the *just valuation* of property; determined or estimated value or price; estimation of the worth, merit, of anything."

In 50 C.J.S., page 1100, the word "just" as an adjective is defined —

"Just" may apply in nearly all of its senses either to ethics or law, denoting something which is morally right and fair and sometimes that which is right and fair according to positive law."

Synonyms for the word "just" are also set forth in this citation as including the following — "legally right; right in law or ethics; equitable; fair; honest; true; and impartial."

These adjectives do very little to qualify the nouns or lend them any range of application as they all imply the definitions of "valuation" and "value". It would seem, therefore, that these nouns are inclusive and sufficient without these adjectives, but consideration of amendments is a matter for the legislature and not for the courts.

The definition of the word "just" quoted above has been confirmed by the Supreme Court of Florida in Lake Hancock & C. R. Co. v. Stinson, 81 So. 512, 77 Florida 333.

The term "just valuation" has been held to be synonymous with "full cash value" in Tyson v. Lanier, 156 So. 2d 833.

In his brief and proposed final decree, the attorney general included an exhaustive survey of all of the constitutional provisions, legislative enactments and judicial construction of the various terms which have been used regarding assessments.

The court's first inclination was to set out in this decree that very excellent review. Space and time prohibit this. The conclusion of the attorney general is that all of these terms have been treated by the courts as being of the same or substantially the same meaning and are probably interchangeable. Further, whichever of these terms are used, the formula, if properly applied, would result in basically identical amounts.

There are three types of property which must be valued by the assessor in making up the tax rolls — (1) real property; (2) tangible personal property; and (3) intangible personal property, such as stocks. Stocks and bonds generally have a readily ascertainable value. It is obtainable from everyday's newspapers in the market quotations. Accordingly, the legislature required that these values be accepted.

In the field of real and tangible personal property there are no readily ascertainable current market prices available. Therefore, the legislature has attempted to lay down criteria to be followed in arriving at such value.

It has been established in Green v. Walter that intangibles must be assessed at current market value. Therefore, in order for the assessor to accomplish fair and equal taxation, each of the other classes of property must likewise be assessed at current market value.

The evidence of qualified real estate appraisers is that the term "fair market value" is a commonly used term in the real estate appraisal field and is generally accepted as the end goal of any commercial appraisal.

Competent expert testimony was to the effect that the criteria which the assessor is required to consider in arriving at "just valuation" are practically identical to the factors considered by a real estate appraiser in arriving at the fair market value of a particular property. *The opinion of the assessor was that the phrases, "full cash value", "just valuation", and "fair market value" are synonymous.* The tax manuals issued by the comptroller's office contain instructions and recommend procedures which are the same as those described by the expert appraisers in arriving at fair market value. Part of the information used by the tax assessor's office in seeking "just valuation" are the recorded sales throughout the county which are the very thing that determine what is the fair market value.

From such evidence and from a study of the aforesaid constitutional and statutory provisions and decisions of the Supreme Court and the District Courts of Appeal, the court declares that the term "fair market value" is legally synonymous with the term "just valuation", and is the best available standard by which assessments can be measured.

*Comparison of just valuation with full compensation*

Our constitution also provides that property may not be taken by the process of eminent domain except upon payment to the property owner of "full compensation".

The cases in this field seem to confirm that there also "fair market value" is the goal of the appraisers and this supports the propriety of the declaration that "fair market value" is legally synonymous with "just valuation."

This court is of the opinion that the appraisal methods used for the purpose of determining how much should be paid by government under eminent domain proceedings may very well constitute a satisfactory method for determining assessed value for the purposes of taxation. It might be said, what is fair for the government is fair for the governed, for despite all the criticism, that government is us, it is our creation and its existence and life depends upon what we determine to make it.

*Separation of powers*

The Florida constitution, article II, relating to the distribution of powers provides that —

"The powers of the government of the State of Florida, shall be divided into three departments; Legislative, Executive and Judicial; and no person properly belonging to one of the departments shall exercise any powers appertaining to either of the others, except in cases expressly provided for by this Constitution."

The duties of the assessor are clearly defined in the statutes. Fundamentally, he is to make out an assessment roll on all taxable property in the county.

To assess has been defined in Bouvier's Law Dictionary, Vol. 1, page 256 as follows —

"To rate or fix the proportion which every person has to pay of any particular tax. To tax. To adjust the shares of a contribution by several towards a common beneficial object according to the benefit received. To fix the value of; to fix the amount of.

"As used in a covenant to pay rates, etc., 'assessed' means 'reckoned on the value.' "

The separation of powers article prohibits an officer of one branch of the government from lawfully exercising the powers of the other branches. This is precisely what the assessor has attempted to do. In the intangible tax suit he concluded that the constitutional provisions and the legislative implementation of the intangible tax law was improper and unjust. He undertook

to reduce the taxes collected on such property to the barest minimum. The court held that he could not do this.

Here, he has attempted to expand the constitutional homestead exemption from $5,000 to approximately $12,500 by systematic underassessment. He can no more do this than he can return all values to the economic standards of the middle thirties when that amendment was passed. For instance, it is believed that a study of governmental salaries at that time would reveal that such positions provided compensation substantially less than fifty percent of what they now pay. Certainly, we would all like to buy our groceries at depression prices.

### The 1964 tax roll

The 1964 tax roll has been prepared, certified, approved, and delivered by the assessor to the tax collector as required by law. As of December 11, 1964, the tax collector had collected 78.69 percent of the entire 1964 tax roll, amounting to $20,778,157.34; that of said sum, $4,069,400.95 had been disbursed to various agencies of county government, including 47.17 percent to the board of public instruction; that he has issued 150,527 separate tax receipts to an estimated 75,000 taxpayers.

The rights of a citizen with a paid receipt, the turmoil and confusion that would result from a complete recall and revision of such roll, the expense of such procedure and the necessary interruption and delay thereby caused to the work now being and which will be performed on the 1965 roll must all be considered.

In the case of State v. Atkisson, Second District Court of Appeal, case no. 5635, opinion dated Dec. 16, 1964, the court said —

"The parties, both at oral argument and by subsequent stipulation filed in this cause, have agreed that it would be unnecessarily harsh and it would disrupt the taxation process of the city if this court reversed the order of the trial court quashing the alternative writ, thereby requiring the parties to proceed in this cause in the trial court on a contest of the 1964 tax assessment roll at a time subsequent to its completion and the collection of a substantial part of the 1964 taxes. Accordingly, the judgment appealed is reversed with directions to enter an order denying the motion to quash the alternative writ and for further proceedings consistent with this opinion and the stipulation of the parties that further proceedings herein shall relate solely to the 1965 tax assessment roll of the city."

The 1964 tax roll should not be recalled and counsel withdrew his prayer for this relief at the final arguments.

*The 1965 tax roll*

The effort to obtain fair taxation is not new. Jesus was born in Bethlehem because Rome required the taking of a census for the purpose of imposing a capitation tax. This event according to St. Luke, is as follows —

"And it came to pass in those days, that there went out a decree from Caesar Augustus, that *all* the world *should be taxed*.

"And *all* went to be taxed, *every one* into his own city."

Equal taxation is easy enough to obtain when it is a head count or capitation basis but this theory of taxation has long been abandoned. Furthermore our taxes are imposed through representative action and not by empirical edict.

The court takes judicial notice of the critical emergency situation existing with regard to revenues available to the Duval County school system under the constitutional millage limitation and the restrictions resulting by reason of the systematic under-evaluation of all properties in the county, both commercial and residential.

The court finds that the total tax roll will be at least doubled and perhaps tripled when the constitution and laws are complied with.

It was the testimony of the assistant assessor in charge of this revaluation program that it would be at least January 1, 1966 before this task could be completed.

The assessor proposed that he "proceed with the present re-valuation program with deliberate speed to the end that a new tax roll might be completed for 1966 *or as soon thereafter as reasonably practical.*" The assistant stated without qualification that it would be that long before a tax roll could be completed that would comply with the constitution and laws. By necessary implication this testimony prompts the inescapable conclusion that the tax rolls do not now even in the judgment of that office comply with the constitution and laws. While reasonable leeway must be granted to permit compliance the court finds that it is possible to finish this task by July 1, 1965, if everyone in a responsible and official position cooperates. The court has before it resolutions of the county commission stating that it will provide all the funds necessary to do this job.

Now that this disaster has befallen the community everyone wants to stand up and be counted as being in favor of doing some-

thing to alleviate the situation and it is therefore assumed that funds and personnel will be available to speed up this program.

The court concludes that it not only has the power but has the clear duty to require the assessor to take the action necessary to so expedite this program of revaluation that it will be completed by July 1, 1965, or such later date as would permit the other county officers to fulfill their duties. *The 1965 tax roll must be prepared in accordance with law.*

## Revaluation and reappraisal

As Florida came out of the war years and went into its period of population explosion and economic growth, the prevailing underassessment practices which the courts had previously noted became more and more aggravated. The need for general evaluation and re-appraisal became apparent.

In 1951 the legislature passed section 193.111 which authorized the board of county commissioners of each county to cause an appraisal of all property in the county to be made by a company or board of appraisers to be selected by the board of county commissioners. The commissioners were authorized to pay for such task from the county general fund.

This statute has been construed by the attorney general as authorizing the county commissioners to have a revaluation either by an appraisal firm or by a board of appraisers but that both methods could not be used simultaneously. (1958 Op. Atty Gen. 058-199, June 26, 1958).

The report of an appraisal board or the report of an appraisal firm are not binding on the assessor but are advisory to him and may be used as a guide but it still remains his duty to make the final determination. (State v. McNayr, Fla. 1961, 133 So. 2d 312, Freeze v. County of Pinellas, Fla. 1962, 146 So. 2d 97).

The court is of the opinion that it does not have the power to direct the assessor or the county commissioners as to which method should be pursued. The court conceives its duty to require the assessor to comply with the constitutional mandate, legislative requirements and regulatory standards. How he does this is up to him. Counsel for the plaintiff admits this lack of jurisdiction to order an appraisal by an outside firm and the prayer for that relief will be denied.

Furthermore, to make such a change and start anew at this time would make accomplishment of a proper roll for 1965 impossible.

## Alternative relief

The assessor is working on two tax rolls. One is the 1965 tax roll which he has stated will be based on the 1964 roll which in turn is based on the 1963 roll which in turn is based on the 1962 roll and so on back to 1941. The other roll being prepared is the work generally referred to as the revaluation project but which the assessor prefers to call his "equalization program."

In this decree the assessor is required to complete the revaluation in time to be used for the 1965 tax roll and enjoined from basing the 1965 roll on the 1964 figures. He is also required to make monthly reports to this court as to his progress and anticipated date of completion of the revaluation. If in his report of April 1, 1965, he is still of the opinion that he cannot complete the project as required, he may be mandatorily enjoined to simply double each individual assessment on the 1964 rolls before placing it for use on the 1965 rolls. In view of the evidence in this case it is the opinion of this court that while such roll might not be in complete compliance with the law it would be closer to "just valuation" than any roll that has been submitted and tolerated in the last twenty years.

Any taxpayer who feels that such action has resulted in an unlawful or unfair assessment of his property may have recourse to the board of equalization.

Further, if at the time of the filing of the April 1, 1965, report to the court the assessor is of the opinion that he cannot either comply with the mandatory revaluation program or execute the mechanical procedures required by the alternative relief discussed in this section the court will hear further argument on the power and propriety of appointing a person to carry out this decree as may be provided for under Rule 3.15, Florida Rules of Civil Procedure.

It is, therefore ordered, adjudged and decreed that —

1. This court has jurisdiction over the parties and the subject matter of this action.

2. This is a proper class suit on behalf of the taxpayers of Duval County, and the class is adequately represented.

3. This is an appropriate action for a declaratory decree and for the supplemental and coercive relief hereinafter granted.

4. Since 1941 the office of the assessor of taxes of Duval County has been systematically, deliberately and intentionally underassessing real and personal property at a steadily decreasing ratio of its true value and that these practices are illegal and unconstitutional.

5. By reason of the practices set forth in the preceeding paragraph the 1964 tax roll and preceeding ones have not been prepared in compliance with the law but that by reason of the lapse of time, the inconvenience to the public, the confusion and detriment to public agencies and offices, and the impractibility of adjustment and correction, none of such previous tax rolls are declared to be invalid or void.

6. The announced intention of the assessor and his assistant to prepare the 1965 tax rolls upon the 1964 tax rolls constitutes a threatened violation of the constitutional and statutory law of this state and such action will not be permitted.

7. Ralph N. Walter, as assessor of taxes for the county of Duval, state of Florida, is hereby enjoined and restrained from preparing the 1965 tax rolls on the basis of the 1964 rolls and that he be, and is hereby mandatorily enjoined and required to prepare the 1965 tax rolls in accordance with the constitution, the statutes, the regulations of the comptroller and the previous decisions of our appellate courts as determined and construed by this decree.

8. Ralph N. Walter, as assessor of taxes, is hereby required to complete such roll within the time permitted by statute or such extension of short duration as may be granted by the further order of this court or other court of competent jurisdiction.

9. Ralph N. Walter, as assessor of taxes, is hereby required to make a monthly report beginning on February 1, 1965, to this court upon the actions taken, planned, and proposed to accomplish the requirements of this decree and to specifically set forth therein the relative status of accomplishment of the provisions of this decree, and his estimated completion date of the revaluation program.

10. If at the time of the filing of the April 1, 1965, report the assessor is of the opinion that he cannot complete the revaluation program in time to be used for the 1965 tax roll, a hearing will be scheduled to determine if he should be mandatorily required and directed to simply double each individual assessment on the 1964 rolls before placing it for use on the 1965 rolls.

11. Jurisdiction is reserved for the purpose of hearing further arguments and entering such supplementary decree or orders as may be appropriate on the power and propriety of appointing a person to enforce and carry out the terms of this decree which procedure may be provided for under Rule 3.15, Florida Rules of Civil Procedure.

12. This court retains jurisdiction over this cause and of each of the parties hereto for the purpose of entering such further and other orders as may be necessary to fulfill the requirements of this decree.