### HUNTER v. TAX ASSESSOR, et al.
No. 66-495-E.

Circuit Court, Duval County.

December 6, 1966.

150

Glickstein, Crenshaw, Glickstein & Hulsey, Jacksonville, for the plaintiff.

W. Joe Sears, Jr., Stallings & Marr, J. Henry Blount, Walter C. Shea, and Rogers, Towers, Bailey, Jones & Gay, all of Jacksonville, for the defendants.

WILLIAM L. DURDEN, Circuit Judge.

*Final decree:* This case is before the court upon application of the parties for the entry of a final decree. The court has considered the factual and legal issues raised by the pleadings; the oral testimony, the documentary evidence, memorandum briefs, arguments and proposed decrees submitted by counsel.

## A. JURISDICTION, PARTIES AND VENUE

### 1. *Constitutional authority for suit*

The circuit courts of this state have exclusive original jurisdiction in all cases involving the legality of any tax, assessment, or toll. Article V, section 6, Florida constitution.

### 2. *Statutory authority for suit*

Such actions are in equity and the court is required to inquire into and determine the legality, equality and validity of the tax or assessment under the constitution and laws of the state of Florida and to render decrees setting aside such tax or assessments or any part of the same that shall appear to be contrary to law. Section 196.01, Florida Statutes 1965.

### 3. *Jurisdiction over subject matter*

Jurisdiction over the subject matter by the chancery court is not questioned in this suit.

### 4. *Statutory indispensable parties*

The county tax collector and the comptroller of the state are indispensable parties to any suit in any court contesting the validity of any tax assessment. Section 106.03 and 196.14 Florida Statutes 1965.

### 5. *Tax assessor necessary party*

This court has determined in other cases that the county tax assessor is a necessary as well as a proper and desirable party in any such litigation. No such determination was required in this suit because the plaintiff voluntarily named the assessor as an original party defendant. Rule 3.4, Florida Rules of Civil Procedure.

### 6. *County commissioners as parties*

The plaintiff originally named the individual Duval County Commissioners as members of the board of equalization as party defendants. The complaint neither alleged nor sought any relief against such defendants. In this case the plaintiff tendered into court only the amount of the tax admitted to be due and if relief is granted the processing of a refund would not become necessary. Therefore, there existed no reason to incur the additional public expense involved in continuing the county commissioners as parties and on March 16, 1966 an order was entered dismissing them as defendants.

### 7. *Jurisdiction over parties*

Jurisdiction over the remaining parties defendant was not raised as an issue in this suit.

## 8. *Venue*

Under certain circumstances tax litigation involving the state comptroller must be brought in Leon County. The law provides that in all such suits as this the cause of action shall be brought in the county where the land is situated. Section 196.14, Florida Statutes 1965.

### B. BASIC ISSUES CREATED BY PLEADINGS

## 1. *Unlawful assessment*

(a) The plaintiff alleged that the assessment placed upon the subject property was determined arbitrarily, unjustly and unfairly; that it was in excess of the just or fair market value of said property; and that said assessment is unlawful, excessive and illegal and constituted the taking of plaintiff's property without due process of law.

(b) In support of such conclusion plaintiff alleged — (1) The assessor originally valued the property at $130,400. (2) The plaintiff petitioned the board of equalization for a reduction. (3) The board of equalization reduced the assessed valuation to $122,700. (4) The fair market value of the property as of January 1, 1965 was $88,100.

(c) The defeendants denied the material allegations of the complaint.

(d) The gravamen of the cause of action and the basic issue created by the pleadings is to what extent, if any, the assessment or any part of the same is contrary to law.

## 2. *Discretion of tax assessor*

In his first additional and affirmative defense the tax assessor alleged that the relief sought in the complaint was not properly within the cognizance of this court because the 1965 assessment placed on the property is not so different or varied from 100% fair market value of said property as of January 1, 1965, as to be grossly excessive, fraudulent, or arbitrary and that, therefore, the assessed value was arrived at by a reasonable and discretionary exercise of judgment by the tax assessor.

Under the Florida Rules of Civil Procedure, Rule 1.8, the allegations of this defense are deemed denied without further pleading by the plaintiff.

The issue tendered was therefore created by the parties without a ruling by the court on the sufficiency of the defense as a matter of law.

The court conceives this point to be within and as a part of the general issues without the necessity of affirmative allegations by the tax assessor. Therefore, this point will be determined as a part of the general issue.

### 3. Other issues

There are other subsidiary questions of law and fact that are necessary to be determined and which will be discussed and decided later in this decree.

#### C. LAWS ON ASSESSMENTS — GENERAL

### 1. Constitutional provision

The legislature is required to provide for a uniform and equal rate of taxation and to prescribe such legislation as shall secure a just valuation of all property, both real and personal. Article IX, section 1.

### 2. Statutory provision

Section 193.021, Florida Statutes 1965, provides —

> The county assessor of taxes of the several counties shall assess all the real and personal property in said counties in such a manner as to secure a just valuation as required by section 1, article IX of the state constitution. In arriving at a just valuation, the county assessor of taxes of the several counties shall take into consideration the following factors:
>
> (1) The present cash value of the property;
> (2) The highest and best use to which the property can be expected to be put in the immediate future; and the present use of the property;
> (3) The location of said property;
> (4) The quantity or size of said property;
> (5) The cost of said property and the present replacement value of any improvements thereon;
> (6) The condition of said property;
> (7) The income from said property.

### 3. Circuit court general litigation

This court has before it the case of Shuler v. Walter, 24 Fla. Supp. 116. Under the terms of the final decree the tax assessor was ordered to do a complete reappraisal and reassessment of all the property in this county, in accordance with the constitution, the statutes, the regulations of the comptroller and the previous decisions of our appellate courts as determined and construed in that decree.

In doing so the assessor was enjoined to comply with the court's declaration that the term "fair market value" is legally synonymous with the term "just valuation" and was the best available standard by which assessments could be measured.

## 4. Supreme Court opinion — Walter v. Shuler

In a unanimous opinion the Supreme Court of Florida affirmed this court in requiring a complete reassessment for use in the 1965 tax roll. In the opinion Justice Thomas stated —

> We have said much about "X", the unknown quantity, and nothing about how to set it within the bounds prescribed by the legislature in Sec. 193.021. The more we ponder the problem the more difficult the solution appears, but settle it we must, and we have concluded after earnest study that the sensible way to do so is to adopt the chancellor's idea that "fair market value" and "just valuation" should be declared "legally synonymous" and that such is the best way to arrive at the definition of "X". The former term is a familiar one and it in turn may be established by the classic formula that it is the amount a purchaser, willing but not obliged to buy, would pay to one willing but not obliged to sell.
>
> \* \* \*
>
> If assessors will apply that test and in doing so observe the seven guideposts in Sec. 193.021, justness should be secured to the taxpayer and the tangle that has developed should be unraveled. 176 So. 2d 81.

## 5. Supreme Court opinion — Lanier v. Overstreet

This decision and opinion was rendered contemporaneously with Walter v. Shuler. It was written by Justice Roberts. It is a four to three decision with Justices Roberts, Thornal, Caldwell and Ervin in the majority, and with Justices Drew, Thomas and O'Connell in the minority. Some of the language of the majority opinion of which we must be mindful is the following —

> The short answer to this contention is that there is nothing in the legislative regulation respecting the "just valuation" of taxable property; to authorize the assessment of property in accordance with a *potential* use which *might* be made of the property at some future time.
>
> \* \* \*
>
> And all of the legislative directives in this field appear to have been designed to make sure that, in doubtful areas, the assessment will be made on the basis of the actual use to which the property is designed to be put during the particular taxable year.
>
> \* \* \*
>
> By authorizing tax assessors to consider, as one of the factors "in arriving at a just valuation" of property, the use to which the property "can be *expected* to be put in the *immediate* future" (emphasis added), the Legislature has, under the familiar rule of expressio unius est exclusio alterius, prohibited tax assessors from considering potential uses to which the property is reasonably susceptible, and to which it might possibly be put in some future tax year or, even, during the current tax year. To be considered, the use must be *expected,* not merely potential or a "reasonably susceptible" type of use; it must be expected immediately, not at some vague uncertain time in the future. 775 So. 2d 521.

### 6. *Supreme Court opinion — Markham v. Blount*

This decision and opinion was also rendered contemporaneously with Walter v. Shuler. It confirms the preceding decision of Lanier v. Overstreet. 175 So. 2d 526.

### 7. *Supreme Court opinion — Burns v. Butscher*

In that opinion, handed down June 8, 1966, Justice Thomas said —

> As late as 1965, in Walter v. Shuler, 176 So. 2d 81, we held that assessments of less than 100% could not be tolerated and that "X" should be fixed by applying the classic formula for establishing fair market value, namely, the amount a purchaser under no stress to buy a given piece of property would pay a non-necessitous seller. 187 So. 2d 594.

In that case the Supreme Court was directing the mandate to all sixty-seven tax assessors of the state. With this admonition clearly in mind we shall proceed further with this case.

## D. ADMINISTRATIVE PRACTICES AND PROCEDURES

### 1. *Statutory authority and responsibilities*

Section 192.31, Florida Statutes 1965, prescribes the powers and duties of the state comptroller and state budget commission as to uniformity of assessments. The core of this statute is the following language —

> The comptroller shall have general supervision of the assessment and valuation of property, under the supervision of the state budget commission, so that all property will be placed on the tax rolls and the valuation thereof will be uniform and equal, as required by the constitution, and he shall also have supervision over the collection of such taxes.

The case of Burns v. Butscher, supra, involved litigation designed and instituted by taxpayers to compel the state comptroller to fulfill the duties and obligations cast upon him by this and related statutes. The language of Justice Thomas is direct and simple —

> The comptroller with the approval of the budget commission is mandated to establish measurements of values, consistent with those fixed by law, and these standards are declared to be prima facie evidence of just valuation. Any assessor refusing to adhere to them assumes the burden of overcoming the presumption of their merit.
>
> There was merely an effort to control the manner in which the duties were to be performed and judging by the statistics previously given, there is much need for regulation. The exercise of the duty to establish values, carte blanche, would bring strange results as, indeed, has been the case. Exercise of unbridled discretion by 67 tax assessors without their being anchored to any master plan would result in the imbalance already so clearly indicated.

> We do not construe the statute as an attempt at usurpation by the comptroller and budget board of the duties of tax assessors or materially to interfere with their discretion in discharging their duties for as we said in the Walter case there is much room for the play of their judgment as they "receive, weigh and evaluate varying information *** from different sources ***".

## 2. Comptroller's standards and regulations

This court judicially knows of the existence of the Florida Tax Assessor's Guide as authorized by chapter 192.31, Florida Statutes, which was approved and adopted by the Florida Budget Commission. This manual was not offered in evidence and no reference was made to it in argument of counsel.

## 3. Assessor's principles and standards

There was no evidence submitted of standardized regulations in book or pamphlet form which were prepared by the assessor. The principles and practices applied to this case will be discussed later.

### E.   METHODS OF APPRAISING

## 1. General comments

The assessor and the real estate appraisers testified that there are three basic methods followed to reach the classic definition of fair market value. They are —

(a)   Cost. (or Summation)

(b)   Capitalization. (or Income)

(c)   Comparison. (or Market Data)

A study of the textbook authorities confirms the conclusion that "market value" or "fair market value" is the central real estate appraisal concept. They further confirm that those in the appraising field who really care about the dignity, prestige and future of their profession admit that they must discard the old phrases which fragmentize and frustrate their work and destroy all public confidence in their integrity.

In the first place there is nothing really new about the idea that market value is the central real estate appraisal concept.

One of the authorities indicate that Confucius in about the year 500 B.C., as the Master, said unto the scholar, "The value of thy property dependeth upon thy neighbor".

Another authority has it that Publius Syrus, nearly two thousand years ago announced a simple definition of value, "everything is worth what the purchaser will pay for it".

The principles of law that have been established in Shuler v. Walter and other related cases must not be forgotten for a moment. Perhaps we were too long in reaching that point. We must not regress from it. Careful study of the appraising authorities indicates that their movement is in that direction. In McMichael's Appraising Manual, Fourth Edition, at page 7, it is stated — "The appraising business is coming of age and standardizing its principles and practices."

While McMichael obviously recognizes the need for such action, he is not overly optimistic. Note his statement that —

> Since the beginning of time, students of appraising have been creating theories, procedures, and rules for establishing value. These criteria are used daily by everyone in fixing the worth of things bought or services rendered. Despite this fact little has been accomplished in standardizing real estate values — if such a thing is possible.

The hope for the profession of real estate appraising and fair real property ad valorem assessments is contained in the lessons taught in the Encyclopedia of Real Estate Appraising, edited by Edith Friedman and published by Prentice-Hall. It is there stated that —

> Appraisals are made for various purposes, the nature of which determines the basis of valuation or value concept to be adopted. Some feel this means that the same property may have a different value for purchase, sale, mortgage condemnation, estate valuation, foreclosure, general property taxation, inheritance, partition, and long-term investment.
>
> No support for this view can be found in law or reality. Acceptance of the proposition that value is established in the market place by the doings of typical buyers and sellers requires that an appraisal made at a particular time for either buyer or seller should reflect the same conclusion. No property is worth more or less than the going price being paid by informed buyers to equally well-informed sellers, provided there is no abnormal pressure. Statutory law and court decisions likewise lay down the rule that market value is the basis for just compensation in condemnation, and that market value is the basis for appraisal in estate valuation, foreclosure, general property taxation, inheritance and partition.

* * *

> Through the efforts of appraisal societies, appraisal terminology is slowly being standardized, and appraisal theories and techniques are finding universal recognition.
>
> *Attendant upon acceptance of this conclusion is admission of the proposition that there can be but one market value of the same property at a given time.*

## 2. *Definition of three approaches to value*

The Encyclopedia defines the various approaches to value as follows —

> An approach to value is a method based on factual data, by which an indication of value is evolved. Three standard approaches to real estate value have been developed through the experience of professional appraisers: The Cost or Summation Approach, and the Market Data or Comparison Approach. The purpose of the approaches is to set up a zone of reasonableness and to support the final conclusion as to value.
>
> The Cost Approach requires an estimate of the current cost to reproduce or replace a property and the extent to which the property has depreciated. Reproduction or replacement cost, less depreciation plus land value, sets the upper limit of value of the property.
>
> The Income Approach considers the stream of income which the property is likely to produce for an investor or user during its economic life, as compared with income derived from similar properties and compares the return on the investment with the return on other types of investment. Various techniques are employed for capitalization of the income stream into an indication of value.
>
> The Market Data Approach consists of a comparison of the subject property with other similar properties which have been sold in the area, thereby establishing market reaction to the subject property.

## 3. *Guideposts and warnings*

Each of the texts on appraising sets out various guideposts and warnings. Before proceeding to a discussion of the three specific approaches, some of these would bear repeating.

> The appraisal process of establishing value through the three cardinal methods of cost, comparison and capitalization of income must be understood thoroughly and no one of the three should be abused or neglected.
>
> McMichael.

> Whenever possible, all three approaches to value *** should be applied in an appraisal, but one or more approaches may be given greater weight.
>
> Encyclopedia.

> It must be borne in mind that every piece of real estate is an entity unto itself and in some peculiar way is different from every other parcel of property even in the immediate neighborhood.
>
> McMichael.

> More and more are experienced and seasoned appraisers recognizing that they must employ carefully, when they do so at all, such matters as tables, rules and formulas. These are tools that even the experts use carefully although they definitely have their place in

appraising. They cannot ever take the place of well developed judgment.

McMichael.

Market value is indicated as the central real estate appraisal concept.

Encyclopedia.

## F.   SUBJECT PROPERTY (FINDINGS OF FACT)

### 1. *Tax collector's real estate receipt*

The ad valorem tax on the subject property is covered by tax collector's real estate receipt no. RE 72669.

### 2. *Legal description*

Lot One (1) (except the South 75' of the West 51' and the part recorded in Deed Book 1645, page 476, and the West Half (W-½) of Lot Two (2), and that part of the West Half (W-½) of Lot Five (5), recorded in Official Records Volume 1920, page 400, all in Block Ten (10), Hart's Map of Jacksonville.

### 3. *Ownership*

The plaintiff, Benjamin R. Hunter, was and still is the owner of the subject property.

### 4. *Land dimensions*

The basic property has a front footage on Bay Street of 106.5 feet with an irregular depth varying from a minimum of 85.7 feet to a maximum of 108.07 feet.

The plaintiff also owns the 10.4 alleyway strip behind the Bostwick Building, which provides ingress and egress from Ocean Street. It is 51 feet long running east and west. The buildings and locations will be fully described in the next section.

### 5. *Present use of land*

The building on the property is a perfect rectangle. It fronts on Bay Street and fills the entire width of 106.5 feet. The building has a standard depth of 75.5 feet. It will be called, as it is, the Hunter Building.

This building is one of about five buildings facing south on the north side of Bay Street between Ocean Street on the west and Newnan Street on the east. There is one fifty foot building to the west of the subject building and this latter structure is called the Bostwick Building. The Bostwick Building is on the northwest corner of the intersection of Bay Street and Newnan Street.

Back to back to this row of buildings facing Bay Street is a similar row of buildings facing north on Forsyth Street.

Between these two rows of buildings running for the entire block is an alleyway irregular in width due to the irregularity in the depth of the buildings backing up to this alleyway.

This alleyway, for the entire length of plaintiff's property behind the Bostwick Building of 51 feet and for an additional 54.39 feet behind the Hunter Building, is the subject of an easement granted by deed to a property owner located to the north of the plaintiff.

The remaining length of this alleyway on the east end of the Hunter property is 52.5 feet.

North of the alleyway at the east end of the subject property is an additional twenty feet or so which serve as parking spaces, which plaintiff rents.

It is the finding of the court that in addition to the granted easement rights, all of the alleyway, except that part used for the rented parking spaces, is a public way for those who have business to do at the rear of all these buildings.

This does not constitute a determination of property rights for that issue was not adversely litigated before the court. It is merely an expression that in estimating the fair market value these encroachments on the absolute fee simple title must be recognized and evaluated.

Therefore, and in summary, what we have to consider may be divided into four separate categories for purposes of discussion but which in truth is one unit —

(1) We have the land on which the Hunter Building is located.
(2) We have the 10.4 feet strip running behind the Bostwick Building which is subjected to both a deeded and prescriptive public use.
(3) We have the 10.4 feet (approximately) alleyway back of the Hunter Building which is subjected partly to the granted easement and partly to a prescriptive public use.
(4) We have the parking spaces back of the Hunter Building and to the north of the alleyway. Parenthetically, it will be noted that even the parking space renters could not get to their spots without traversing the alleyway described in (2) and (3) above.

In making the determinations regarding the use of the alleyway, the court considered the various authorities cited on the law of easements and licenses. Since, however, this is not and cannot be an action to try title in any way, such authorities were not felt to be applicable.

The provisions of the assessment statute relating to present use of the land are applicable and the findings of the court as to such use are factors in determining value.

Concurrently with this conclusion, the court readily agrees with counsel for the assessor that over and above the granted and prescriptive easements this alleyway has a value to the plaintiff both as the owner of the fee and a joint user thereof. The fee ownership value is reduced by the granted and prescriptive use, but the tax assessor correctly placed it on the tax roll in plaintiff's name. The plaintiff does not argue to the contrary. The argument centers over what, if any, value remains to the owner.

### 6. *Estates and interests assessed*

The plaintiff owns a fee simple interest in all the land.

Part of the land is subjected to a granted easement.

Part of the land is subjected to a prescriptive easement or license.

### 7. *Street and number location*

Numbers 107, 109, 111, 113, 115 and 117 East Bay Street.

### 8. *Zoning*

Municipal Business B, which includes general business, distribution and light industry.

#### G. IMPROVEMENTS (FINDINGS OF FACT)

### 1. *Building*

The property is improved with a two-story brick building. The building completely covers the property for the front footage on Bay Street and runs to a depth of 75.3 feet. The building faces Bay Street in a southerly direction. The building is of light mill construction, having a built-up gravel roof, concrete and wood floors, and plastered walls. The ground floor is divided into five stores. The second floor consists of loft space with pine floors and plastered walls. The building is approximately forty years of age and in apparent sound condition. Photographs of the building from the front and from the air show it to be substantial, but of a different era.

#### H. PRESENT USE AND OCCUPANCY (FINDINGS OF FACT)

### 1. *General*

This use is as of January 1, 1965.

### 2. *Ground floor*
*No. 107 East Bay Street: (Vacant)*

This small store was in the process of being remodeled into attorney offices. A new brick and glass front, new floor, walls and ceiling are being installed *by the tenant.*

### No. 109 East Bay Street: Benny's Mens Store

This store has an old style plate glass front, pine floors, plastered walls, metal ceiling and old style fluorescent lights. There is one large sales room with a small restroom in the rear.

### No. 113 East Bay Street: Barber Shop

This store has an old style plate glass front, tile floor, plastered walls, and fluorescent lights. It consists of one large room with a restroom in the rear.

### No. 115 East Bay Street: I. Beverly Nalle, Inc. Real Estate Office

This store has been remodeled into modern offices and has a modern plate glass and brick front, asphalt tile floors, plaster and wood paneled walls, and acoustic tile ceiling. This part has been divided into a general office — 4 private offices, 2 restrooms and a supply room.

### No. 117 East Bay Street: Burbridge Realty Company

This store has been remodeled *by the tenant* and has a modern brick and plate glass front, asphalt tile floors, plastered walls and acoustic tile ceiling. This part contains one large room and a restroom.

### 3. Second floor

This is 111 East Bay Street. It is rented in part to Alcoholics Anonymous and in part for storage to American Title Insurance Company. It is mainly vacant.

### 4. Alleyway

Ingress to and from parking spaces and to rear entrances of ground floor stores and offices.

### 5. Parking spaces

Four parking spaces available and rented.

## I. IDENTIFICATION IN THE COMMUNITY

### 1. Geographical location

The property is located in the 100 block of East Bay Street. It is a block and a half east of Main Street. It is approximately one-half block from the nearest corner of the City Hall and a block and half from the nearest corner of the Duval County Courthouse. Within the block it is in and immediately across the street from it are buildings of old origin mainly built shortly after the fire destroyed Jacksonville in the early 1900's.

It is four blocks southeast of the retail business district of downtown Jacksonville. Bay Street is a heavily traveled traffic artery extending from East Jacksonville to LaVilla. Along Bay Street in this area will be found many old masonry buildings occupied by real estate offices, a seed store, second hand stores, furniture stores, liquor store, and an Army and Navy Store.

## 2. Past — historical land and building use

This area for many years was considered to be a close-in wholesale and distribution area catering to marine trade along the river-front. In addition there were several retail stores catering to the cheaper trade.

Downtown Jacksonville, of which the subject property is a part, was considered the merchandising center of Jacksonville, Duval County and northeast Florida for many generations up until the mid-1950's. In about 1956 the general merchandising sales of the downtown area commenced a rather precipitous drop due to the increasing construction of suburban shopping centers.

## 3. Present — land and building use

During the 1950's a large tract of land was assembled for the new Duval County Courthouse and Jail on the south side of Bay Street between Market and Liberty Streets along the riverfront. Shortly after the construction of the courthouse, land was acquired on the south side of Bay Street between Market and Newnan Streets along the river-front for a new city hall. These new public buildings have changed the neighborhood pattern and some development in this area has taken place. An old two-story store building at the northwest corner of Bay and Market Streets was remodeled into a modern office building. The old courthouse building at Forsyth and Market Streets was remodeled into a modern office and bank building. Some of the old stores along Bay Street have been demolished and the land used for automobile parking.

The most recent construction in this area is the new public library which has recently been constructed at Forsyth and Ocean Streets on the site of the old city hall.

With the building of the new parking lots, the city hall and the county courthouse, the property near the subject property is being converted into professional office spaces, but not of the highest rental value.

Although in state of transition at the present time, this area of Bay Street east of Main is anticipated to have considerable future potential for professional office location.

### J. THE HIGHEST AND BEST USE TO WHICH THE PROPERTY CAN BE EXPECTED TO BE PUT IN THE IMMEDIATE FUTURE

In view of the recent economic developments in Duval County the transition of this property from a low class mercantile area to moderate level professional office has been deferred.

It is generally believed that the property here under consideration is in an area of transition. For years the property east of Main Street and near the waterfront was in a state of absolute deterioration and depreciation.

This area has gradually improved but development is slow. Further development is anticipated at a much slower rate.

Its best use for the immediate future is its present use and it is so declared and found. It has prospects but there is no clear indication as to when they may be expected to mature.

### K. COST APPROACH TO VALUE

*1. Standards and principles*

*(a) General*

The value of property is arrived at by estimating reproduction or replacement cost of the building new, less estimated accrued depreciation, if any, plus estimated land value.

This is also known as the 'summation approach'. It is similar to the old 'summation method' prevailing up to the early 1920's by which the cost of the land and of the improvements were added together to reach an estimate of value.

The cost approach is particularly useful in estimating the value of *certain kinds of rental projects.*

"Generally the cost approach tends to set the upper limit of value, because a well-informed buyer would supposedly not spend more money to obtain a property than it would cost to reproduce it."

*(b) Methods of estimating cost*

The replacement or reproduction cost of an improvement, new, may be estimated by any one of several standard methods, generally classified as the quantity survey method, the unit-in-place method, the square foot method, and the cubic foot method.

In the square foot cost comparison method, the known or estimated square foot cost of a similar property is applied to the square foot area of the subject property. Square foot cost

data may be obtained from cost manuals issued by engineering and appraisal firms and agencies, or from the appraiser's own cost data files.

*(c) Estimating depreciation*

The appraiser must estimate the amount of accrued depreciation, and deduct such amount from the estimated cost of the building new. Accrued depreciation is the loss that has taken place in a building up to the time of appraisal, and consists of —

(1) Physical deterioration.

(2) Functional obsolescense.

(3) Economic obsolescence.

Physical deterioration is the wear and tear on the structural members of the property. It is inherent in the building, and includes loss of soundness through cracking, settling or undermining of foundations, structural decay, wear and tear, corrosions and encrustations, and so on. Functional obsolescence is likewise inherent in the building and includes deficiencies such as outmoded plumbing fixtures or architecture, over-aged elevators, excessively high ceilings, improper placing of columns, insufficient electric outlets, and other inadequacies due to poor design or poor layout. Economic obsolescence is the result of forces outside of the building itself, such as downgrading of the neighborhood, changes in economic conditions, drastic increases in applicable tax rates, and so on.

*(d) Cost of land*

After the appraiser has estimated the cost of the building new and has deducted from such cost any accrued depreciation, he must add the estimated land value in order to arrive at a conclusion as to the value of the property by the cost approach.

The value of the land is generally estimated by comparing the subject property with similar property in the area, and making adjustments for differences between the subject and the comparison property. (Encyclopedia of Real Estate Appraising)

*2. Plaintiff's testimony*

The plaintiff did not use the cost approach to value. He did state that he had a cost basis of $45,000 but no one argues this figure as controlling present fair market value.

*3. Plaintiff's appraiser*

J. Alvin Register defined this method as follows — "The cost approach to value is based on the value of the land if vacant, plus the depreciated value of improvements. The cost approach

is one of the most essential steps in the valuation process as cost new tends to set the upper limit of value. A prudent buyer will not ordinarily pay more for a property than it would cost to replace the property at the time or to obtain an equally satisfactory substitute".

Mr. Register found that the building had 8,088 square feet and that this had a construction average cost of $11.50 per square foot, making a total of $93,012. He found that the second floor is completely depreciated, that the first floor had a 50% depreciation and a 50% economical obsolescence showing a complete depreciated value of improvement of zero.

He defined the total economic obsolescence here as attributable to the loss in value caused by an oversupply of store space, excessive taxes and poor economic conditions in the downtown area.

He indicated the value of the land was $88,100. Under the cost approach Mr. Register gave no value to the building.

### 4. Assessor's testimony

The tax assessor has taken the position that so long as a building stands on a parcel of property it should not be depreciated out completely to zero and put on the tax roll as having no value. The building was determined by the assessor to have a replacement cost of $10 per square foot. Considering functional and physical depreciation the building was depreciated 75%. Additional consideration of the income being produced by the property indicated that the plaintiff was not receiving a complete return from the land on the basis of the standard capitalization rate. The building was therefore, by the assessor, depreciated an additional 15% to 90% on the basis of economic depreciation.

It therefore appears that the tax assessor's figures show 8,132 square feet on each floor or a total of 16,264 square feet at a unit price of $10 per square foot or a new cost of $162,640 and shows a remaining useful value of 10% or $16,264.

### 5. Defendant's appraiser

The defendant's appraiser, Frank Osborn, did not use the cost approach at all.

### 6. Discussion by the court

The court finds that the building does have some minimum value and that it should not be carried on the tax roll at zero, since the highest and best use for the property in the immediate future is its present use and the building does bring in considerable rents.

L.   CAPITALIZATION APPROACH TO VALUE

## 1. *Standards and principles*

### (a)  *Definition of approach*

The income approach to real estate evaluation is a method of estimating value, based on factual data with respect to the income yield of the property. The method is also known as the 'capitalization approach' (or approach by capitalization), because the income derived from the property, generally net annual income, is reduced to an indication of value by a mathematical process or computation known as 'capitalization' and the income approach to value is a method of measuring the present worth of the benefits to be reaped from the property in the future.

### (b)  *Definition of income*

Income consists of periodic benefits or 'returns' arising through ownership of the property. The income approach to value is most effectively utilized when the real estate is essentially a monetary income or investment property.

### (c)  *Definition of expenses*

All costs and charges properly related to maintaining and operating the property.

### (d)  *Net income*

The balance remaining after deducting from gross income all related expenses and losses.

### (e)  *Capitalization rate*

The capitalization rate to be applied to net income in estimating value is the rate selected by the appraiser as representing a fair return on the particular investment at the particular time, considering the risk involved. It is the rate currently required to attract capital to the particular type of investment.

### (f)  *The capitalization process*

Capitalization is a mathematical process for converting the stream of income derived from real estate into capital value. Value is based on the present and prospective income from the property. A factor, known as the 'capitalization rate' or 'present worth factor' is applied to the estimated net annual income produced by the property, to determine its value. Net income is arrived at by deducting from gross income all costs of maintenance and operation.

### (g)  *Depreciation factors*

Depreciation may be defined as loss or decline in the capital value of property caused by physical deterioration or obsoles-

cence. Obsolescence may be functional (that is, inherent in property), or it may be economic (that is, related to the environment).

## 2. *Plaintiff's testimony*

The plaintiff testified that over the last several years he had a gross income of slightly under $9,000 with expenses totalling around $5,000, leaving a net income of around $4,000. It was anticipated that the gross receipts for the year 1965 would be about $8,500 and if taxes were assessed on a valuation of $117,000 expenses would be around $6,800 leaving a net income of around $1,700. This computes out at about one and one-half percent net income, which under the capitalization approach is not sufficient to justify the investment.

## 3. *Plaintiff's appraiser*

Mr. Register concluded that on the capitalization approach that the very most the property would justify would be the valuation of $88,100. This was based upon a 7% rate of capitalization.

## 4. *Assessor's testimony*

The assessor gave no separate testimony on the capitalization approach but simply affirmed his appraiser.

## 5. *Defendant's appraiser*

Mr. Osborn used a capitalization rate of 6% on a property value of $107,000 and ended up with a deficit. It is therefore obvious that in his opinion this property would not justify an investment on this approach.

## 6. *Discussion by the court*

Both Mr. Register and Mr. Osborn included in their income approach computations an increased rental on the basis of improvements made by the tenants. It was the position of each of them that the property had these improvements and therefore they should be considered in computing the income approach. This conclusion is wholly erroneous. The expenses of remodelling in each of the two instances was sustained and paid for by the tenants. Because of this investment the tenants were actually paying less rental than the property in its improved status would bring. This is appropriate for it was their investments that improved the property. Actually the only thing that is of benefit to the owner in these remodelled premises is the improved status of the property which is returned to him at the end of their leases. Upon examination by the court each appraiser admitted this

to be true and that so far as the capital investment and ownership is concerned perhaps it would not be proper to increase the estimated income because of this factor. This court has concluded that improvements made by a lessee cannot be used in computing the value of the ownership. All that can be done is to compute the estimated improved value which will return to him at the end of the leases.

Taking out these two factors it is obvious that the property does not sustain a capitalization approach of anywhere near the assessed valuation. On a capitalization basis it is doubtful that the property would be worth more than $80,000.

## M.  COMPARISON APPROACH TO VALUE

### 1. Standards and principles

The market approach to value is the method of appraisal in which the value of property is inferred from sales of comparable property. It is also known as the comparative or comparable sales approach, the comparison method, or the market data approach to value. Value is measured by observing what comparable properties are selling for in the market.

The basis for the market approach to value is the market or exchange concept of value and price. Such a concept assumes that value is established by buyers and sellers in the market place. This idea of value has long been held by economists. It is the only concept which is accepted by the weight of authority in law and business.

### 2. Plaintiff's testimony

It is the testimony of the plaintiff that he received an offer of around $80,000 for the property and he felt that this was a fair value for the property in the depressed circumstances that now exist.

### 3. Plaintiff's appraiser

Mr. Register studied numerous comparable sales and determined that on the basis thereof the property had a value of $88,100.

### 4. Assessor's testimony

The assessor was of the opinion that based on comparable sales that this property had a front foot value of $1,000 which would make a land value of $107,000, a value to the building of $10,000 — making a total value of $117,000. The assessor placed the greatest emphasis and reliance on this approach.

## 5. *Defendant's appraiser*

Basically the defendant's appraiser, Mr. Osborn, agreed with the estimations made by the county assessor in that he, too, valued the land itself as having a $1,000 front foot value and while he estimated the remaining value of the building at $10,000, in cross examination he reduced this element $3,000 — so that his ultimate appraisal on the market approach was $114,000.

## 6. *Discussion by the court*

Counsel for the assessor requested the court to make a determination that it is proper as a matter of law to use the front foot value for the assessing of property which was done by the assessor in his appraisal, rather than the square foot basis which was used by the plaintiff's appraiser. The court's study of the appraising manuals indicates that, depending upon the circumstances each of these methods is acceptable. It seems to be generally true that as property becomes more and more complex and in a highly developed section that the general method used runs toward a square foot basis. This is perfectly logical. The further out in the county the larger the unit of measurement. The more near to the central downtown area the smaller the unit of measure. Obviously this is a matter of judgment as to whether this property has moved from front footage to square footage and the court cannot say one approach precludes the use of the other.

### N. ASSESSOR'S AND APPRAISERS' CORRELATION ANALYSIS AND CONCLUSIONS AS TO VALUE

## 1. *Standards and principles*

In every appraisal, a vast amount of data must be sifted, analyzed, and related to the subject property before a final estimate of value can be made. The purpose of correlation is to boil down this information and to choose the basic and fundamental facts that give the greatest support to an estimate arrived at by a particular approach.

In applying each approach to value, the appraiser makes certain assumptions based on observation and sound reasoning. Each approach rests to some extent upon opinion evidence. The task of the appraiser in correlation is to seek out the approach that is supported by a preponderance of factual evidence. An approach that lacks support of a quantity of important factual data rests to a greater degree on opinion evidence. All available data for each of the three approaches must be processed, even

if it may seem that an approach is relatively weak and less supportable than other approaches. The process of relating, weighing, and analyzing the data must go on within the development of each estimate of value by each approach.

Value can never be calculated by adding up the several estimates arrived at in processing each approach and taking an average of these estimates. Averages do not lead to a sound conclusion as to value; if an error was committed in estimating under only one of the approaches, it would merely be carried forward in a final estimate by average.

## 2. Primary approach to value

It is necessary to make use of all of the facts and related data that have a bearing in any way upon the final estimate of value of a given property. Some data will usually be available for each of the three approaches to value. However, one of the approaches will be found to be most applicable to a particular type of property, and it will be evident to the appraiser that the data supporting this approach has much greater strength than the data applicable to the other approaches. The approach to value that is best supported by factual data in the subject appraisal is the primary approach; the others are secondary approaches to value.

The appraiser makes a thorough study of all pertinent information gathered by him, and analyzes and weighs the strongest and most applicable data under each approach. The final conclusion as to value is based on the approach which is supported by the most convincing data, that is, the primary approach.

## 3. Secondary approach to value

The accuracy of this estimate is checked by the results reached under the other approaches used, the secondary approaches.

The secondary approaches act as a means of checking the estimate arrived at by the primary approach.

## 4. Plaintiff's testimony

The plaintiff obviously holds this property as an investment. He is of the opinion that in view of the increased taxes his investment has been not only threatened but perhaps ruined. He recognizes that the property is in a state of transition and merely figures that the property should carry itself from the standpoint of taxes and other expenses until it comes into its own. This is reasonable and of course is a factor which should be taken into consideration. He concluded the property had a value of $80,000.

### 5. Plaintiff's appraiser

Mr. Register also felt that this was the primary approach to the value and that the taxes should not be so high that they render the investment so unattractive that it causes a further depression in the market for this type of property. He concluded the property had a value of $88,100.

### 6. Assessor's testimony

The assessor's main emphasis is on the fact that the property in the area has been selling for $1,000 per front foot and that the building has some remaining value and that it should be assessed on that basis. He concluded the property had a value of $117,000.

### 7. Defendant's appraiser

The basic approach of Mr. Osborn is also based on the market data and he feels that the property has the value indicated by other sales in the area of $114,000.

### 8. Discussion by the court

The court is aware of the fact that the primary approach to the value of this property is the market or comparison approach. Consideration must be given to the income or capitalization approach, however, because all admit this is what this property now is and will be for some time. It obviously has a good prospect for the indeterminate future but for the present and immediate future it must be looked upon as investment property taking full use of the building now located on it and leaving taxes at such a point as to not necessarily make it attractive from an investment standpoint but also not raise them up so high that neither the plaintiff nor any other investor can hold it while it is going through this stage of transition.

#### O.   COURT'S CONCLUSION AS TO VALUE

All in all the court is of the opinion that this property generally has a front foot value of $1,000 or a total land value of $107,000. The court agrees with the assessor and Mr. Osborn that the building has some value since it is contributing to the production of income at this time. The court feels that the $7,000 value placed thereon by Mr. Osborn is a fair one. Therefore, on a summary of the approaches this property would have a face value of $114,000, subject to reduction because of the static market conditions in that area.

The assessor and the appraisers admitted that the market in this area was generally depressed, that the downtown area was

subject to even more repression and the expected development of this specific area has been slowed down considerably. In view of these factors it is the opinion of the court that the fair market value of the property should be reduced so as to permit this property to continue on the tax rolls as an investment for either the plaintiff or for a fair market value purchaser. The court is of the opinion that this property has a fair market value of $102,600 and should be placed on the tax rolls for the year 1965 at that figure.

### P. DETERMINATION OF INTEREST

Counsel for the parties have submitted extensive authorities as to whether or not the penalty provisions of section 193.51 should be imposed. Upon the payment of the amount of tax which Mr. Hunter admitted to be due and upon his equitable tender to pay any other amount that the court ultimately determines to be due and upon his good faith litigation of the issues before the court and upon consideration of all the evidence submitted to it the court is of the opinion that it would be inequitable, unfair and unjust to impose any penalty provisions against this taxpayer. The court necessarily finds that the additional amount of taxes which is due upon the assessed value determined by the court became due on April 1, 1965 and that the taxpayer should pay the statutory rate of 6% from that date to the date of the additional payment.

It is therefore ordered, adjudged and decreed that —

(1) The 1965 final ad valorem real property assessment on the subject property as set by the assessor is grossly in excess of its fair market value and the illegal portion thereof should be set aside.

(2) The fair market value of the property as of January 1, 1965 for ad valorem assessment purposes is $102,600.

(3) There is due and owing from the plaintiff to the defendant tax collector the amount of taxes on this valuation less the amount paid, plus interest at the rate of 6% on that balance from April 1, 1965 to the date of payment.

(4) The execution procedures provided for by the statutes of this state are stayed for a period of thirty days during which the taxpayer may make payments required by this decree.

(5) As the taxpayer has received some of the relief which he requested it is the determination of the court that each of the parties to this litigation should sustain their own costs and therefore costs are not assessed against any party.