## TIMUQUANA COUNTRY CLUB v. TAX ASSESSOR, et al.
### No. 67-9929.

Circuit Court, Duval County.

April 4, 1968.

Ulmer, Murchison, Ashby & Ball, Jacksonville, for plaintiff.

Stallings & Marr, J. Henry Blount, Walter C. Shea, Rogers, Towers, Bailey, Jones & Gay, W. Joe Sears, Jr., and Howard C. Kaufold, all of Jacksonville, for defendants.

WILLIAM L. DURDEN, Circuit Judge.

*Final judgment:* This case is before the court upon application of the parties for the entry of a final judgment. The court has considered the factual and legal issues raised by the pleadings, the oral testimony, the documentary evidence, memorandum briefs, arguments, and proposed final judgments submitted by counsel.

### Statement of the case

Timuquana Country Club originally brought suit challenging the 1965 real property ad valorem tax assessment on its property. The plaintiff alleged that the assessment was excessive, discriminatory and arbitrary, and therefore unconstitutional and unlawful. Subsequent suits were filed challenging the assessment for the years 1966 and 1967.

Beauclerc Country Club, owned by Property Corporation, filed similar suits contesting its assessment for the same period.

Selva Marina Country Club filed a similar suit contesting its assessment for the same period.

These suits for all of the years involved were consolidated for trial and were presented together.

San Jose Country Club filed a similar suit contesting its assessment for the year 1967. San Jose agreed to accept the formula and determinations made in the consolidated suits for application to its properties.

### Golf course and country club as exempt property

At some stage during the litigation it was suggested but was not seriously argued that all recreational facilities should be granted constitutional or statutory exemption from ad valorem taxation.

The theory behind such a contention was based upon the premise that Florida holds itself out to be a mecca for year-round tourism and a haven for retirement. The natural advantages that make such assertions possible are too numerous and obvious to recount.

There is also the theory that a healthy body is as important as a healthy mind and that therefore the law should grant the same benefits to recreational facilities as it does to educational, scientific and literary institutions.

There is a forum in all democratic governments for the resolution of all theories such as that one. It may be in the legislature, it may be in the constitutional revision commission or it may be in the electorate or in a combination of two or more of such forums. It is not in the courts. The judiciary must accept and construe the constitution and laws as it finds them.

Article 9, §1 of the Florida Constitution provides "for the exemption from taxation of all real and personal property for municipal, educational, literary, scientific, religious, or charitable purposes".

§192.06, Florida Statutes 1967, specifies the property which shall be exempt from taxation and the list is quite lengthy. Included are exemptions for property developed to the following purposes — educational, literary, benevolent, fraternal, charitable, scientific, all houses of public worship, parsonages, burial grounds not owned or held for speculative purposes, public libraries, agricultural societies, regular constituted women's clubs of Florida, American Legions, national college fraternities, national college sororities, homes, club houses and hospitals used for the purposes of providing care for veterans, labor organizations, medical societies and libraries, charitable non-profit hospitals, homes for the aged licensed by the state board of health, these being all in addition to the other nonspecified exempted property.

The 1967 session of the Florida legislature passed chapter 67-528, which is entitled "An Act Relating to Outdoor Recreational or Park Lands" which perhaps offers such benefits to recreational facilities but no one contends that the statute applies to the cases under consideration.

In the Florida Tax Assessors' Guide reference is made to an opinion of the attorney general rendered on August 4, 1954 and numbered 054-184. This opinion is quoted as having held that — "There is no statute or court decision holding a country club to be either an educational, scientific, literary or charitable association, therefore they are not exempt from ad valorem tax". After carefully trying to find this opinion in the Biennial Report of the Attorney General for the years 1953-1954 it was finally determined that opinion no. 054-184 was omitted from the report along with several score other opinions. See page 754, et seq. Therefore the court is not able to confirm this ruling but it is obvious that it was a proper conclusion and the court has no hesitation in confirming that determination.

There appear to be other opinions indicating that the property of private clubs is not considered as used for religious, charitable or educational purposes and is therefore taxable. See Johnson v. Sparkman, 159 Fla. 276, 31 So.2d 863, University Club v. Lanier, 161 So. 78, Opinions of the Attorney General numbered 045-135, 053-10 and 052-101.

The ultimate conclusion of the court is that a golf course or country club is not entitled to constitutional or statutory exemption under the law as it presently stands.

### Law on Assessments — General

#### 1. Constitutional provision

The legislature is required to provide for a uniform and equal rate of taxation and to prescribe such legislation as shall secure a just valuation of all property, both real and personal. Article IX, §1.

#### 2. Statutory provision

§193.021, Florida Statutes, 1965 provides —

The county assessor of taxes of the several counties shall assess all the real and personal property in said counties in such a manner as to secure a just valuation as required by section 1, article IX of the state constitution. In arriving at a just valuation, the county assessor of taxes of the several counties shall take into consideration the following factors:

(1)  The present cash value of the property;

(2)  The highest and best use to which the property can be expected to be put in the immediate future; and the present use of the property;

(3)  The location of said property;

(4)  The quantity or size of said property;

(5)  The cost of said property and the present replacement value of any improvements thereon;

(6)  The condition of said property;

(7)  The income from said property.

#### 3. Circuit court general litigation

This court had before it the case of Shuler v. Walter, 24 Fla. Supp. 116. Under the terms of the final decree the tax assessor was ordered to do a complete reappraisal and reassessment of all the property in this county, in accordance with the constitution, the statutes, the regulations of the comptroller and the previous decisions of our appellate courts as determined and construed in that decree.

In doing so the assessor was enjoined to comply with the court's declaration that the term "fair market value" is legally synonymous with the term "just valuation" and was the best available standard by which assessments could be measured.

## 4. *Supreme Court opinion — Walter v. Shuler*

In a unanimous opinion the Supreme Court of Florida affirmed this court in requiring a complete reassessment for use in the 1965 tax roll. In the opinion Justice Thomas stated —

> We have said much about "X", the unknown quantity, and nothing about *how to set it within the bounds* prescribed by the legislature in Sec. 193.021. The more we ponder the problem the more difficult the solution appears, but settle it we must, and we have concluded after earnest study that the sensible way to do so is to adopt the chancellor's idea that "fair market value" and "just valuation" should be declared "legally synonymous" and that such is the best way to arrive at the definition of "X". The former term is a familiar one and it in turn may be established by the classic formula that it is the amount a purchaser, willing but not obliged to buy, would pay to one willing but not obliged to sell.

* * *

> If assessors will apply that test and in doing so observe the seven guideposts in Sec. 193.021, justness should be secured to the taxpayer and the tangle that has developed should be unraveled. 176 So.2d 81.

## 5. *Supreme Court opinion — Lanier v. Overstreet*

This decision and opinion was rendered contemporaneously with Walter v. Shuler. It was written by Justice Roberts. It is a four to three decision with Justices Roberts, Thornal, Caldwell and Ervin in the majority, and with Justices Drew, Thomas and O'Connell in the minority. Some of the language of the majority opinion of which we must be mindful is the following —

> The short answer to this contention is that there is nothing in the legislative regulation respecting the "just valuation" of taxable property to authorize the assessment of property in accordance with a *potential* use which *might* be made of the property at some future time.

* * *

> And all of the legislative directives in this field appear to have been designed to make sure that, in doubtful areas, the assessment will be made on the basis of the actual use to which the property is designed to be put during the particular taxable year.

* * *

> By authorizing tax assessors to consider as one of the factors "in arriving at a just valuation" of property, the use to which the property "can be *expected* to be put in the *immediate* future" [emphasis added], the Legislature has, under the familiar rule of expressio unius est exclusio alterius, prohibited tax assessors from considering potential uses to which the property is reasonably susceptible, and to which it might possibly be put in some future tax year or, even, during the current tax year. To be considered, the use must be *expected,* not merely potential or a "reasonably susceptible" type of use; it must be expected immediately, not at some vague uncertain time in the future. 175 So.2d 521.

There is a paucity of decisions in regard to the proper approach in the valuation of country club and golf course properties. Those

available deal with condemnation proceedings and are not particularly helpful in the instant case due to the precise location of the subject property and the evidence in this case. U.S. v. 84.4 Acres of Land, 224 F. Supp. 1017, Dist. Ct. W.D. Pnn. (1963); Albany Country Club v. State of New York, 235 N.Y.S. 2d 684 (1962), affirmed 196 N.E. 2d 62, Ct. of App. (1963).

*Methods of appraising*

1. *General Comments*

The assessor and the real estate appraisers testified that there are three basic methods followed to reach the classic definition of fair market value. They are —

    (a) Cost (or summation)
    (b) Capitalization (or income)
    (c) Comparison (or market data)

A study of the textbook authorities confirm the conclusion that "market value" or "fair market value" is the central real estate appraisal concept. They further confirm that those in the appraising field who really care about the dignity, prestige and future of their profession admit that they must discard the old phrases which fragmentize and frustrate their work and destroy all public confidence in their integrity.

In the first place there is nothing really new about the idea that market value is the central real estate appraisal concept. One of the authorities indicates that Confucius in about the year 500 B.C., as the Master, said unto the scholar, "The value of thy property dependeth upon thy neighbor". Another authority has it that Publius Syrus, nearly two thousand years ago announced a simple definition of value, "everything is worth what the purchaser will pay for it".

The principles of law that have been established in Shuler v. Walter and other related cases must not be forgotten for a moment. Perhaps we were too long in reaching that point. We must not regress from it. Careful study of the appraising authorities indicate that their movement is in that direction. In McMichael's *Appraising Manual*, 4th edition, at page 7, it is stated: "The appraising business is coming of age and standardizing its principles and practices."

The hope for the profession of real estate appraising and fair real property ad valorem assessments is contained in the lessons taught in the *Encyclopedia of Real Estate Appraising,* edited by Edith Friedman and published by Prentice-Hall. It is there stated that —

Appraisals are made for various purposes, the nature of which determines the basis of valuation or value concept to be adopted. Some feel this means that the same property may have a different value for purchase, sale, mortgage, condemnation, estate valuation, foreclosure, general property taxation, inheritance, partition, and long-term investment.

No support for this view can be found in law or reality. Acceptance of the proposition that value is established in the market place by the doings of typical buyers and sellers requires that an appraisal made at a particular time for either buyer or seller should reflect the same conclusion. No property is worth more or less than the going price being paid by informed buyers to equally well-informed sellers, provided there is no abnormal pressure. Statutory law and court decisions likewise lay down the rule that market value is the basis for just compensation in condemnation, and that market value is the basis for appraisal in estate valuation, foreclosure, general property taxation, inheritance and partition.

\* \* \*

Through the efforts of appraisal societies, appraisal terminology is slowly being standardized, and appraisal theories and techniques are finding universal recognition.

*Attendant upon acceptance of this conclusion is admission of the proposition that there can be but one market value of the same property at a given time.*

## 2. *Definition of three approaches to value*

The *Encyclopedia* defines the various approaches to value as follows —

An approach to value is a method based on factual data, by which an indication of value is evolved. Three standard approaches to real estate value have been developed through the experience of professional appraisers: The Cost or Summation Approach, the Income or Capitalization Approach, and the Market Data or Comparison Approach. The purpose of the approaches is to set up a zone of reasonableness and to support the final conclusion as to value.

The Cost Approach requires an estimate of the current cost to reproduce or replace a property and the extent to which the property has depreciated. Reproduction or replacement cost, less depreciation plus land value, sets the upper limit of value of the property.

The Income Approach considers the stream of income which the property is likely to produce for an investor or user during its economic life, as compared with income derived from similar properties and compares the return on the investment with the return on other types of investment. Various techniques are employed for capitalization of the income stream into an indication of value.

The Market Data Approach consists of a comparison of the subject property with other similar properties which have been sold in the area, thereby establishing market reaction to the subject property.

*Cost approach to value*

1. *Standards and principles*

(a) *General*

The value of property is arrived at by estimating reproduction or replacement cost of the building new, less estimated accrued depreciation, if any, plus estimated land value.

This is also known as the "summation approach". It is similar to the old "summation method" prevailing up to the early 1920's by which the cost of the land and of the improvements were added together to reach an estimate of value.

The cost approach is particularly useful in estimating the value of *certain kinds of rental projects.*

Generally the cost approach tends to set the upper limit of value, because a well-informed buyer would supposedly not spend more money to obtain a property than it would cost to reproduce it.

(b) *Methods of estimating cost*

The replacement or reproduction cost of an improvement, new, may be estimated by any one of several standard methods, generally classified as the quantity survey method, the unit-in-place method, the square foot method and the cubic foot method.

(c) *Estimating depreciation*

The appraiser must estimate the amount of accrued depreciation, and deduct such amount from the estimated cost of the building new. Accrued depreciation is the loss that has taken place in a building up to the time of appraisal, and consists of —

(1) Physical deterioration.
(2) Functional obsolescence.
(3) Economic obsolescence.

Physical deterioration is the wear and tear on the structural members of the property. It is inherent in the building, and includes loss of soundness through cracking, settling or undermining of foundations, structural decay, wear and tear, corrosions and encrustations, and so on. Functional obsolescence is likewise inherent in the building and includes deficiencies such as outmoded plumbing fixtures or architecture, over-aged elevators, excessively high ceilings, improper placing of columns, insufficient electric outlets, and other inadequacies due to poor design or poor layout. Economic obsolescence is the result of forces outside of the building itself, such as downgrading of the neighborhood, changes in economic conditions, drastic increases in applicable tax rates, and so on.

*(d) Cost of land*

After the appraiser has estimated the cost of the building new and has deducted from such cost any accrued depreciation, he must add the estimated land value in order to arrive at a conclusion as to the value of the property by the cost approach.

The value of the land is generally estimated by comparing the subject property with similar property in the area, and making adjustments for differences between the subject and the comparison property. *(Encyclopedia of Real Estate Appraising)*

*Capitalization approach to value*

1. *Standards and principles*

*(a) Definition of approach*

The income approach to real estate evaluation is a method of estimating value, based on factual data with respect to the income yield of the property. The method is also known as the "capitalization approach" (or approach by capitalization), because the income derived from the property, generally net annual income, is reduced to an indication of value by a mathematical process or computation known as "capitalization" and the income approach to value is a method of measuring the present worth of the benefits to be reaped from the property in the future.

*(b) Definition of income*

Income consists of periodic benefits or "returns" arising through ownership of the property. The income approach to value is most effectively utilized when the real estate is essentially a monetary income or investment property.

*(c) Definition of expenses*

All costs and charges properly related to maintaining and operating the property.

*(d) Net income*

The balance remaining after deducting from gross income all related expenses and losses.

*(e) Capitalization rate*

The capitalization rate to be applied to net income in estimating value is the rate selected by the appraiser as representing a fair return on the particular investment at the particular time, considering the risk involved. It is the rate currently required to attract capital to the particular type of investment.

### (f) The capitalization process

Capitalization is a mathematical process for converting the stream of income derived from real estate into capital value. Value is based on the present and prospective income from the property. A factor, known as the "capitalization rate" or "present worth factor" is applied to the estimated net annual income produced by the property, to determine its value. Net income is arrived at by deducting from gross income all costs of maintenance and operation.

### (g) Depreciation factors

Depreciation may be defined as loss or decline in the capital value of property caused by physical deterioration or obsolescence. Obsolescence may be functional (that is, inherent in property), or it may be economic (that is, related to the environment).

## Comparison approach to value

### 1. Standards and principles

The market approach to value is the method of appraisal in which the value of property is inferred from sales of comparable property. It is also known as the comparative or comparable sales approach, the comparison method, or the market data approach to value. Value is measured by observing what comparable properties are selling for in the market.

The basis for the market approach to value is the market or exchange concept of value and price. Such a concept assumes that value is established by buyers and sellers in the market place. This idea of value has long been held by economists. It is the only concept which is accepted by the weight of authority in law and business.

## Assessor's and appraisers' correlation analysis and conclusions as to value

### 1. Standards and principles

In every appraisal, a vast amount of data must be sifted, analyzed, and related to the subject property before a final estimate of value can be made. The purpose of correlation is to boil down this information and to choose the basic and fundamental facts that give the greatest support to an estimate arrived at by a particular approach.

In applying each approach to value, the appraiser makes certain assumptions based on observation and sound reasoning. Each approach rests to some extent upon opinion evidence. The task of the appraiser in correlation is to seek out the approach that is supported by a preponderance of factual evidence. An approach

that lacks support of a quantity of important factual data rests to a greater degree on opinion evidence. All available data for each of the three approaches must be processed, even if it may seem that an approach is relatively weak and less supportable than other approaches. The process of relating, weighing, and analyzing the data must go on within the development of each estimate of value by each approach.

Value can never be calculated by adding up the several estimates arrived at in processing each approach and taking an average of these estimates. Averages do not lead to a sound conclusion as to value; if an error was committed in estimating under any one of the approaches, it would merely be carried forward in a final estimate by average.

## 2. *Primary approach to value*

It is necessary to make use of all of the facts and related data that have a bearing in any way upon the final estimate of value of a given property. Some data will usually be available for each of the three approaches to value. However, one of the approaches will be found to be most applicable to a particular type of property, and it will be evident to the appraiser that the data supporting this approach has much greater strength than the data applicable to the other approaches. The approach to value that is best supported by factual data in the subject appraisal is the primary approach; the others are secondary approaches to value.

The appraiser makes a thorough study of all pertinent information gathered by him, and analyzes and weighs the strongest and most applicable data under each approach. The final conclusion as to value is based on the approach which is supported by the most convincing data, that is, the primary approach.

## 3. *Secondary approach to value*

The accuracy of this estimate is checked by the results reached under the other approaches used, the secondary approaches.

The secondary approaches act as a means of checking the estimate arrived at by the primary approach.

### *Appraisal authorities*

In the work entitled *The Appraisal of Real Estate,* 4th edition, prepared by a special committee of the American Institute of Real Estate Appraisers, the text discusses this particular type of property at page 29. It is stated therein that the cost approach, as opposed to the market approach, is the most effective method by which to obtain a value indication of this type of property.

In Miss Edith Friedman's work, *The Encyclopedia of Real Estate Appraising,* chapter 30 is devoted to the appraising of a country club and approves application of the cost approach. The author, in chapter 3, dealing with the cost approach method, at page 38 points out that in the case of special purpose properties, the cost approach is the chief approach to value, and goes on to demonstrate why the market and income approaches are not particularly acceptable.

Mr. Orgel, in his two-volume edition on *Valuation and Eminent Domain,* 2nd edition, adheres to such an approach in regard to club houses at pages 178 and 181 in §38 of vol. 1, and pages 4, 8, and 17 in §188, etc., in vol. 2.

The publication *Appraisal Journal* has presented a number of articles in regard to appraisal technique in regard to appraisals of country club and golf course properties. These are — *"Country Club Appraisal",* October, 1960; *"Criteria for Use of Cost Approach with Special Purpose Property",* January 1963; *"Acreage Valuation of Land for a Golf Course",* October, 1964; *"Factors in Golf Course Appraisal",* July, 1964; and *"Valuation Factors in Club Development",* October, 1965.

While it is true that the authorities place heavy emphasis on the use of the cost approach in the appraisal of special purpose properties such method has its recognized limitations. In Friedman, supra, at page 39, it is said —

> However, even as to special purpose properties, the cost approach is recognized to have but limited significance in measuring market value. Its use is sanctioned with caution, and then only because other approaches to value are not available.

> As indicated above, the cost approach to value of an improvement does not reflect entirely the prevailing economic or market conditions. The cost of an improvement cannot be recovered in the market if there is no need for the improvement, if the property is not put to its highest and best use, if the structure is an over-improvement or of poor design . . .

> The cost of a project is an essential factor in appraisal, but in estimating value, the appraiser must also apply the market data approach. He must ascertain what others are paying for similar property . . .

> The cost approach to value is particularly limited in estimating the value of an estate or expensive mansion-type property where, within a short time, 50% to 75% of the cost may not be recoverable.

Orgel, in §189, page 4, of the text previously cited, states that values placed on special service properties through the cost approach "are not really values at all". His discussion of the use of the cost approach in valuing special purpose properties is as follows —

Aside from serving as an upper limit to appraisals based on other methods of valuation, another important use for which the best appraisal authorities justify reproduction cost is in the case of so-called "service properties", that are owned for non-profit uses and that seldom come on to the market. Churches, clubhouses, golf courses, schools and university buildings are of this nature. Neither their market value (if they have any) nor their value to their owners can be estimated by recent sales or by a capitalization of net earnings. In the absence of either of these more reliable tests of value, an appraiser can do little but add the structural costs of the building to the market value of the vacant land, with some arbitrary deductions for physical and functional depreciation. The resulting figure ordinarily sets an upper limit to the worth of the property to the owner, and it roughly measures that value on the assumption that the owner would find it worth while to replace the structures with substantially identical ones in case they were destroyed.

### Golf Courses and Country Clubs as special purpose properties

The assessor and all the appraisers agreed that a golf course and country club is a special purpose property and a single purpose property. It is clear from a study of the authorities and consideration of the expert testimony offered in these cases that the capitalization or the income approach to value has little, if any, application to a golf course and country club. Such facilities are not created for the purpose of making a profit and the most that a country club can hope for is to minimize the amount of subsidization that must be provided for by its dues paying members.

There was some testimony to the effect that in the event that the golf courses were sold for the purpose of having a public golf course it would be difficult to justify a value of more than $300,000 even on the finest country club. While the court will not say that it is improper even to consider such evidence, it must and does say that such evidence is so weak and insufficient that it is entitled to little weight.

The authorities and experts pretty well support the conclusion that a special purpose property such as golf courses and country clubs, churches, hospitals or other single purpose properties should be valued first by the cost or summation approach. It is also true and the authorities confirm that the cost or summation approach gives the higher limit of value and does not necessarily establish the fair market value of the property. Such testimony is however, relevant and proper to consider. Our assessing statute itself requires consideration be given to the cost of the property involved. The cost or summation approach was used by either the assessor and one or more of the appraisers in each of the cases. Our taxing laws and the cases construing them require a determination of the

fair market value of the property. In the golf course cases it has been made relatively clear that the most persuasive evidence on this issue is provided by the comparison or market data approach and that this approach to value is the one on which the strongest reliance should be placed. Here, however, we find ourselves confronted with the necessity of deciding which of two courses of procedure would be the most persuasive.

Appraiser Frank Osborn favored the comparison of one golf course with others and did so on the basis of some ten to fifteen golf courses located throughout the state. Evidence on the golf course sales outside of Duval County indicated that there were only one or two sold for over $500,000 and that most of them sold for under that figure. This approach constitutes a most difficult method of obtaining the proper conclusion because it is next to impossible for the appraiser or the assessor and certainly for the court to take into consideration the different value per acre for land in Alachua County as compared with Dade, the cost of construction between Duval and Pinellas counties, or the dozens of other factors that go into creating a market price between a willing buyer and a willing seller. It seems to the court that the most sensible method of assessing golf courses is to give consideration to all value approaches but place principal reliance on the two following procedures — one is the cost or summation approach which places the upper limit on the property.

Then, we should consider the market approach. Then there are two limitations which must be recognized. The first is that land upon which the golf course is located would have no more value than undeveloped land sitting in the same spot would have. The cost of developing the golf course would not be a factor and as a matter of fact, it may cost money to "undevelop it"; that is to say, tear down bunkers, do away with the greens, fill in the traps and other such activities. Therefore, if comparable sales indicate that land in the area is selling for $3,000 an acre the land underlying the golf courses is worth no more than this and probably somewhat less. It should be borne in mind that the second aspect is even more of a detriment to value. That is to say, if you have 150 acres committed to a golf course and its facilities you may get $3,000 per acre for the 150 acres involved, but the improvements and facilities would be reduced in value to a minimal amount. Obviously, if the land is going to be developed for residential or other uses, its facilities would have no purpose to serve except in a rare case where it might be possible to develop a private club of some sort, but even so, this value would be minimal compared to the cost of constructing a country club facility.

*Highest and best use of property*

The assessor and every one of the professional appraisers testified that the highest and best use of the property for the present and for the immediate future is as a golf course and country club.

While there may be argument that the highest and best use for the subject property is residential, this assumption would tend to avoid the cold hard facts of reality. If the plaintiff's property were entirely unimproved acreage, the above premise would most likely be correct. However, due to the nature of the improvements, both building and related facilities, and land improvement, the highest and best use of this property for the immediate future must be its present use. To change this use to another would require the expenditure of large sums of money. No doubt, some day the demand for another use may become so substantial that the required expenditure will be justified, but this is not the case at the present time.

*Central issue*

It having been determined that the highest and best use of the property now and in the immediate future is as a golf course and country club, the central issue which is created is the fair market value of each of the properties for such purpose.

In the case of Timuquana there is the secondary question of the value of 110 acres not devoted to the golf course or related facilities.

*Comparability of golf courses*

The court has before it the four principal golf courses located in this county, although, since the institution of this suit several others have either been constructed or are under construction which will compete with them from the standpoint of desirability. As a matter of fact, one such first-class golf course was completed prior to the institution of these suits but is not directly involved in the litigation and that is Deerwood Country Club. Others which will be on the tax rolls for 1968 are Hidden Hills, Fairways, DuClay and Pine Lakes.

The casual observer, like the weekend golfer, will be inclined to say that a golf course is a golf course, is a golf course. This is no more true than the statement that a rose is a rose, is a rose. To the discriminating connoisseur of roses and golf courses no two roses or golf courses are identical. Perhaps similar but not identical.

In an effort to achieve a higher degree of uniformity in assessments the court admitted evidence available as to the assessed values of all golf courses in the county. Admittedly each golf course

would have a different value. But just as certainly the assessor should apply the same standards and principles to all similar properties. The court has heretofore stated that no one assessment is an island unto itself — that each one is to some degree related to the others. This is particularly true with regard to special or single purpose properties.

*Acreage:* When we compare golf courses with each other the first factor to bear in mind is the number of acres utilized in the golf courses and related facilities. Does it have broad fairways, comfortable, safe, secure and insulated such as Timuquana or is it a short, tight, narrow, dangerous golf course like Beauclerc? Furthermore, when we are talking about valuation of land on an acreage basis the number of acres involved directly controls the overall value.

*Location:* Is it located in a densely populated area with plenty of population for supporting membership such as San Jose or is it in a distant, slowly developing, yet potentially beautiful section such as Selva Marina. Is it already established, well-founded and fully operating, giving reciprocal value to lands around it and in return receiving value from the homes around it such as Timuquana, San Jose and Beauclerc, or is it in effect a bait for future home developments such as Selva Marina and Deerwood. During the course of the lengthy litigation Deerwood's development has continued while Selva Marina's has stagnated.

*Facilities:* Is it a beautiful country club with plush and commodious facilities such as all four of the courses in litigation before me, or is it one competing for the public golfer at low prices with minimum facilities such as Brentwood and Pinetree?

*Other land available:* Is there plenty of land to compete with the vacant acreage that would be available if the golf course were put out of business such as there is at Deerwood and at Selva Marina or is there a more pressing need for the land such as exists in the case of San Jose and Beauclerc and to a lesser extent, Timuquana?

*Fair market value:* These are all questions that go into the minds of the prospective sellers and the prospective buyers. The criteria which the courts have laid down is — what would the property bring in the open market? The factors above show very clearly that while cost is an interesting consideration it obviously will not be a controlling factor.

What the court is trying to do is to come up with a formula which will be fair to all of the taxpayers of this county and which will be relatively fair among the various golf courses located here.

There are a few comments which should be made about each of the four courses in litigation —

*Timuquana:* The first point to remember is that it has 109 acres included in its assessment which are not committed to the golf course nor to any of the related country club facilities. It does provide a highly desirable and to a limited extent buffer zone. Therefore, this part has been separately valued. We therefore shall consider the 173 acres that are committed to the golf course. This is by far the largest of the courses under consideration. The market for acreage is not as strong in the Timuquana area as it is in the San Jose and Beauclerc area. Timuquana has by far the largest club house area. It also has the greatest age and functional obsolescence.

*San Jose:* San Jose is in the center of a densely populated and growing area in the south side. It has 142 acres and it is therefore somewhat smaller than Timuquana and obviously therefore has fewer acres included in its valuation.

*Beauclerc:* This is a very tight, narrow 108.9 acre golf course. It is located in the same general area as San Jose and is subject to the same benefits and detriments as are attributable to San Jose.

*Selva Marina:* Selva Marina is a championship layout. Its prospects are great for the future. At the moment, however, it has many additional acres of land competing with it in the market place and therefore reducing the value. It has 163 acres.

*Comparisons:* The basic factual data on each course is included in the chart attached. A casual or prejudiced comparison will reveal only what the beholder desires to see. An objective analysis will reveal a fairly competent effort based on the evidence submitted.

In an effort to establish standard principles consistent with the evidence presented and to show the result thereof the tax assessor has prepared a chart showing the comparability of the various golf courses in the county. Most of such evidence is contained in the tax assessor's green assessment sheets which were placed in evidence. From the facts presented in regard to these other properties, it appears that in order to achieve a fair, equal, and legal tax roll in this respect, some of these other assessments will have to be reviewed and increased for the forthcoming tax roll.

The values stated for the golf courses in litigation is the fair market value found by the court. The values stated for the remainder are the new assessments that will result from the application of the principles established here. Several of the newer courses are still under review. The chart referred to follows on the next page.

## GOLF COURSES

| CLUB | Acreage | River Frontage | Per Acre Value | Club House Sq. ft. Area | Date Constr. |
|------|---------|----------------|----------------|-------------------------|--------------|
| Timuquana* | 177.5 | 545 ft | $3,000 | 35,874 | 1923 1949 1959 1964 |
| San Jose | 142 | None | 3,250 | 21,156 | 1926 1948 1957 1960 |
| Beauclerc | 108.9 | None | 3,250 | 15,625 | 1953 |
| Deerwood* | 265 | None | 1,500 | 7,100 | 1961 |
| Selva Marina | 163 | None | 1,500 | 16,500 | 1960 1961 1965 |
| University | 104 | 525 ft | 2,750 | 8,200 | 1966 |
| Hyde Park | 128 | None | 3,000 | 10,500 | 1926 1960 |
| Brentwood | 130 | None | 2,500 | 5,800 | 1932 |
| Dunes | 142.8 | None | 1,200 | 5,300 | 1966 |

*Additional acreage in assessment not included in golf course or these figures.

## COMPARABILITY

| Deprec. Rate % Good | Pool | Tennis Courts | Other Auxil. Bldgs. | Total Land Value | Deprec. Bldg. Value | 1965 Assessed Value | Total Value |
|---|---|---|---|---|---|---|---|
| 60% | 27 x 78 80 x 88 | Yes | Yes | $532,500 | $279,243 | $880,900 | $811,700 |
| 60% | 45 x 104 16 x 42 | Yes | Yes | 461,500 | 254,604 | 758,600 | 716,100 |
| 60% | 35 x 75 18 x 32 | Yes | Yes | 353,925 | 201,252 | 562,900 | 555,200 |
| 75% | 77 x 52 32 x 44 | Yes | Yes | 397,500 | 152,232 | 591,000 | 549,700 |
| 75% | 45 x 105 | No | Yes | 244,500 | 201,045 | 467,800 | 445,500 |
| 75% | 72 x 82 | Yes | Yes | 286,000 | 98,494 | New | 384,500 |
| 60% | 45 x 80 | Yes | Yes | 384,000 | 81,514 | 145,500 | 465,500 |
| 50% | None | Yes | Yes | 325,000 | 36,442 | 101,400 | 361,400 |
| 75% | None | Yes | Yes | 171,360 | 36,357 | New | 207,700 |

### Country club and golf course property

The court, pursuant to the discussion contained hereinabove, holds that the market value of the plaintiff's 177.5 acres where its golf course, club house, and related facilities are located, is $532,500. This valuation reflects both the actual land value, stressing the factors of a present country club, golf course, and recreational use, and the land improvement value for the same purposes.

The court holds and finds that the club house and related improvements have a depreciated market value of $279,243.

Therefore, the total assessed value of the plaintiff's country club and golf course lands and its improvements is hereby held to be $811,700.

### Additional unimproved acreage

Turning to the value of the unimproved acreage presently surrounding the golf course on the southwest and north, by the same token this land must be assessed on an unimproved acreage basis. These lands are not restricted in any manner, such as those used for actual club house, golf course, and related facilities.

The evidence adduced in regard to this land indicates that some of this land is more valuable than other portions. The portion bordering the Naval Air Station's northern boundary and continuing around the southwesterly boundary of this land, due to its location and other existing factors, would realize a lesser market price per acre than the remaining portion of this buffer land located around the northwestern and northern boundaries of the golf course property. These valuations would range from a low of $1,000 per acre to a high of in excess of $4,000 per acre. In making this determination, the court still must realize that in the normal instance, residential lands adjoining an existing golf course reflect an increase in value—due, primarily, to such existence. However, in regard to this particular case, it is doubtful that this factor is as readily present, due to the long membership waiting list currently held by the plaintiff. In short, proposed residence owners would have no guarantee of membership and club benefits.

The court holds, on the basis of the evidence adduced, that on an average per acre value, the total value of this property is $220,000.

### Determination of interest

Counsel in this and other cases have submitted extensive authorities as to whether or not the penalty provisions of §193.51 should

be imposed. Upon the payment of the amount of tax which is admitted to be due and upon equitable tender to pay any other amount that the court ultimately determines to be due and upon good faith litigation of the issues before the court and upon consideration of all the evidence submitted to it the court is of the opinion that it would be inequitable, unfair and unjust to impose any penalty provisions against this taxpayer. The court necessarily finds that the additional amount of taxes which is due upon the assessed values determined by the court became due on April 1 of each year involved and that the taxpayer should pay the statutory rate of 6% from that date to the date of the additional payment.

It is therefore ordered and adjudged that —

(1) The 1965, 1966 and 1967 final ad valorem real property assessments on the subject property as set by the tax assessor are grossly in excess of its fair market value and the illegal portion thereof should be set aside.

(2) The fair market value of the plaintiff's golf course and country club property as of January 1 of each of such years for ad valorem tax assessment purposes is $811,700.

(3) The fair market value of the plaintiff's unimproved acreage land as of January 1 of each of such years for ad valorem tax assessment purposes is $220,000.

(4) There is due and owing from the plaintiff to the defendant tax collector the amount of taxes on the total overall valuation, less the amount paid, plus interest at the rate of 6% on that balance from April 1, 1966, in regard to the 1965 tax assessment, and from April 1, 1967 in regard to the 1966 tax assessment, and from April 1, 1968 in regard to the 1967 tax assessment to the date of payment.

(5) The execution procedures provided for by the statutes of this state are stayed for a period of thirty days during which the taxpayer may make payments required by this judgment.

(6) As the taxpayer has received some of the relief which is requested, it is the determination of the court that each of the parties to this litigation should sustain its own costs, and therefore, costs are not assessed against any party.